Edward S. BURTON et al., Appellants,

v.

MATANUSKA VALLEY LINES, Inc., a corporation in the Territory of Alaska, Appellee.

No. 15030.

United States Court of Appeals Ninth Circuit.

April 8, 1957.

Rehearing Denied July 5, 1957.

Harold J. Butcher, Anchorage, Alaska, for appellants.

Edgar Paul Boyko, Anchorage, Alaska, for appellee.

Before DENMAN, Chief Judge, and POPE and LEMMON, Circuit Judges.

POPE, Circuit Judge.

Appellee Matanuska Valley Lines, Inc., a common carrier of passengers by bus, had operated for some years an integrated system of bus lines within the City of Anchorage, Alaska, within the nearby military bases known as Elmendorf Air Force Base and Fort Richardson Military Reservation, between those bases, and between the bases and the City of Anchorage, and throughout the public highways surrounding the City and the bases, and extending over a large area in South Central Alaska. It held a franchise from the City of Anchorage, a certificate of public convenience and necessity from the Territory, and licenses from the military authorities on the bases.

Appellant, Anchorage Bus Company (here called Anchorage Bus), through its officers, the individual appellants, shortly before this action arose, procured from the Military Commands contract permission to operate a bus business for hire between and within those bases, in competition with Matanuska Valley Lines (here called Matanuska). Anchorage Bus then announced that it was prepared, and was about to commence bus operation in direct competition with Matanuska in all the areas in which the latter had established lines, including those in the City, those between the City and the bases, and in the areas outside the City and the bases. Asserting that for these latter operations Anchorage Bus had no lawful franchise, certificate or permit to operate, and that the proposed competitive operation would be ruinous to Matanuska, and cause it irreparable injury and damage, the latter brought this action against Anchorage Bus, and its officers, seeking among other things, an injunction against its proposed operations outside the military bases. After notice and hearing upon affidavits and documentary evidence, the court granted Matanuska's motion for a preliminary injunction. This appeal is from that interlocutory injunction.

The first complaint shown in this record (an amended complaint) was filed October 25, 1955. How long prior thereto the action was commenced does not appear. But it is apparent that shortly after the action was begun, Anchorage Bus began to take steps designed to assure the fulfillment of its intention to operate in competition with Matanuska. On October 21, 1955, Anchorage Bus obtained from the Alaska Bus Transportation Commission a certificate of public convenience and necessity to furnish bus transportation between the City and the military bases. Four days later that

certificate was suspended "until a public hearing could be held." The order recited that suspension was granted upon Matanuska's protest that the certificate had been issued without notice, and that the Anchorage Bus operations would put Matanuska out of business. It was ordered that hearing would be had on December 6, 1955, as to whether the Anchorage Bus certificate should be reinstated and Matanuska's certificate modified "to allow concurrent operations by other authorized bus companies."

On October 31, 1955, Matanuska made its motion for a preliminary injunction. Hearing on the motion and the affidavits filed in its support and in opposition thereto was had on November 10, 1955. On November 14, 1955, the court announced its decision to grant a preliminary injunction effective until December 6, 1955, the date set for hearing by the Commission, and directed plaintiff to prepare findings and a form of order.

When the Commission met, as contemplated, it made no decision as to either question, that is whether Anchorage Bus should have a certificate of public convenience and necessity, or whether Matanuska's certificate should be ruled non-exclusive. The reason for this non-action was that the Commission believed (erroneously, it developed) that Anchorage Bus could travel between the City and the bases without traversing any Territorial roads. Making showing of this failure of the Commission to act, and that Anchorage was about to commence the operations which had been enjoined, Matanuska renewed its application for a temporary injunction asking that such injunction be continued during the pendency of the suit.

At this stage of the proceedings, the commanding officer of the Elmendorf Air Force Base moved into the arena on the side of Anchorage Bus. According to an affidavit of a local business man, the deputy base commander, who issued the telegram shortly to be mentioned, stated that commitments had been made to Anchorage Bus for an exclusive contract to operate on the bases, and that to make that operation successful, Anchorage Bus needed the revenue from base to City operations, and the officer felt bound to support the new company to the limit. On December 21, 1955, the Commission received from the Commander of the Air Force Base a telegram stating that Matanuska's liability policy was insufficient coverage for operation on the military reservation and that it was not adhering to schedules; hence he was seeking authority from the Secretary of the Air Force to cancel Matanuska's license; that if this occurred hardship would result unless operation between the City and the bases by another operator was authorized; and that the insurance, equipment and on-base service of Anchorage Bus was entirely adequate and satisfactory. Upon receipt of this telegram, the Commission, immediately, and without notice, issued a temporary certificate to Anchorage Bus.[1]

Contrary to the hope implied in the Commander's telegram, Matanuska's service on the bases and between them and the City was never suspended. This was the first time in the more than three years it had held a license on the base,

1. It is not entirely clear just when this temporary certificate would go into effect. Section 9(d), Chap. 93, Session Laws of Alaska, 1949, provides: "Except as otherwise provided in this Act, all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, as the Commission may prescribe * * *."

The statute's provision for temporary certificate, § 7(a), provides: "To enable the provision of service for which there is an immediate and urgent need to a point or points having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier by bus or a contract carrier by bus, as the case may be. Such temporary authority shall be valid for such time as the Commission shall specify, and shall create no presumption that corresponding permanent authority will be granted thereafter."

that any suggestion of lack of adequate insurance had been made, and at once Matanuska procured additional coverage to meet the Commander's complaint.[2] It is also plain that the parties and the court considered that the court's ruling of November 14 preceding, that a preliminary injunction should issue, was still in effect, for on December 23 Anchorage Bus moved the court to dissolve the temporary injunction, mainly on the ground of the action of the military authorities and the issuance of the temporary certificate. This was heard, on affidavits filed in support and in opposition, and denied on December 27. During a portion of the period since November 14, the court had been considering proposed findings offered by Matanuska, and exceptions of Anchorage Bus thereto. On January 16, 1956, the court made and filed its findings and conclusions and issued the preliminary injunction from which this appeal is taken. The injunction was conditioned upon plaintiff giving a bond in the sum of $40,000 to cover costs and damages. It enjoined operations between the City and the bases, in the City, and in the Territory, but expressly excepted and permitted operations within the military bases.

On this appeal much of the argument by appellant relates to the question as to whether Matanuska should prevail upon the final trial of this action. Plaintiff cannot win, it is said, for two reasons: (1) Anchorage Bus had a certificate of convenience and necessity,—the one issued December 21, 1955, described above; and (2), Matanuska's certificate from the Commission, and its franchise from the City are neither of them "exclusive," notwithstanding they purport to be such.

Before we go into the questions which must be answered in order to evaluate either of these two points,—

questions, which we shall note, are not easily answered, we should first observe the limited scope of review which is permitted us upon an appeal from a temporary injunction. This limitation arises from the nature of an interlocutory injunction, and from the purposes to be served thereby. Such an injunction preserves the status quo and protects plaintiff from irreparable injury during the pendency of a suit until such time as the court may adjudge and finally determine the rights of the parties. Necessarily the court must presuppose that in the case at bar it *may* turn out that plaintiff will ultimately lose. Thus the court *may* finally find the facts against the plaintiff who procured the temporary injunction. But this *possibility* does not compel a denial of a temporary injunction if proper showing be made therefor; otherwise a court, which necessarily requires time to reach a final determination, would have no way to protect a party who may suffer irreparable loss if the status quo be not preserved. Without this power to issue interlocutory injunctions, courts would be unable to make their final judgments effective, for the very right to be protected, or the subject of the action itself, might be destroyed irreparably during the period required to arrive at an ultimate determination of the action.

And just as a court must of necessity obtain time in which to determine which party is right upon the facts, so in a substantial number of cases time is necessarily required to resolve grave, difficult and complicated questions of law. If, in such a case, it is ultimately decided that the party who obtained the temporary injunction cannot win, that in itself does not demonstrate that it was wrong to issue the injunction. For a considerable latitude of judicial discretion is allowed the trial court in its determination

---

2. On December 22, 1955, the Commander wrote Matanuska suspending its authority to operate on the base, and directing that it cease operations on December 27. On December 23 Matanuska procured the additional coverage to meet the officer's complaint. (The letter had suggest-

ed that Matanuska might make "further demonstration to us of your financial responsibility and evidence that you carry adequate liability insurance" and then the officer would consider granting a new license to operate.)

whether the situation requires a preservation of existing conditions through an injunction pendente lite, and our more deliberate conclusion that the ultimate decision must be against a permanent injunction does not in itself warrant a reversal of the interlocutory order.

We know of no better statement of this principle than that found in Love v. Atchison T. & S. F. Ry. Co., 8 Cir., 185 F. 321, 331, as follows: "But the granting or withholding of an interlocutory injunction rests in the sound judicial discretion of the court of original jurisdiction, and where, as in the case in hand, that court has not departed from the equitable principles established for its guidance, its orders may not be reversed by the appellate court, without clear proof that it has abused its discretion. * * * An appeal from an order granting or refusing an interlocutory injunction does not invoke the judicial discretion of the appellate court. The question is not whether or not that court in the exercise of its discretion would make or would have made the order. It was to the discretion of the trial court, not to that of the appellate court, that the law intrusted the granting or refusing of these injunctions, and the only question here is: Does the proof clearly establish an abuse of that discretion?"

And in Ohio Oil Co. v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972, the Supreme Court, expressly citing with approval the Love case, said: "Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the

moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted."

■ When the tests thus stated are applied to the facts of the present case, we are forced to conclude that the interlocutory injunction here under review must be sustained. The court below was presented with a number of questions which were both serious and difficult. One of these was whether the certificate of convenience and necessity authorizing Matanuska's maintenance of transportation facilities between the military bases and the City was an exclusive one.[3]

Matanuska's certificate, dated September 17, 1949, and issued by the Transportation Commission, was expressly stated to be an exclusive one. The Territorial Act of March 23, Chap. 93, Sess. Laws of Alaska, 1949, provided in § 2(e) that the Commission should have power to issue certificates of convenience and necessity, which authority "shall include the discretion to issue exclusive certificates on such routes and upon such conditions as the Commission deems necessary or advisable * * *." It is contended that this legislative provision is null and void because it violates the provisions of the Act of Congress enacted in 1886, now found in 48 U.S.C.A. § 1471, and providing in part as follows: "The

3. A related question of somewhat less significance here is whether Matanuska had an exclusive franchise to operate its bus transportation system in the City. The franchise, granted by ordinance to Matanuska, provided that the grantee "shall have the exclusive right or franchise to operate a motor bus service, or trolley bus service as a common carrier over the streets of the City of Anchorage, Territory of Alaska, and other points without the City of Anchorage to points within the City of Anchorage. * * * " The ordinance granting such franchise was enacted January 24, 1956.

By Chap. 91, Sess.Laws of Alaska, 1949, the city councils of such cities as Anchorage were authorized to grant franchises "including exclusive franchise privileges" for bus transportation systems and the same chapter provided that exclusive franchises theretofore approved were ratified and given full force and effect under the Act. It is noted that a portion of the operations of Anchorage Bus which were enjoined by the court below were within the City and upon the City's streets. See also footnote 6 infra.

legislatures of the Territories of the United States now or hereafter to be organized shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * Granting to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever. In all other cases where a general law can be made applicable, no special law shall be enacted in any of the Territories of the United States by the Territorial legislatures thereof."[4]

It is by no means clear that this language of the 1886 enactment was intended to prohibit this or other territorial legislatures from recognizing that public utilities are natural monopolies and providing for regulation of such utilities by means comparable to that commonly provided by state legislatures, which often find that such public utilities may best be regulated by making them monopolies. In Idaho Power & Light Co. v. Blomquist, 26 Idaho 222, 141 P. 1083, 1088, the court said: "There is nothing in the Constitution that prohibits the Legislature from enacting laws prohibiting competition between public utility corporations, and the Legislature of this state no doubt concluded that a business like that of transmitting electricity through the streets of the city and furnishing light and power to the people must be transacted by a regulated monopoly, and that free competition between as many companies or as many persons as might desire to put up wires in the streets is impracticable and not for the best interests of the people."

We know of nothing either in the legislative history of this congressional provision or in the decided cases dealing with it, which would suggest that it was intended to be a limitation upon the Alaska legislature's power to provide a normal system for regulation of bus companies. Nixon v. Reid, 8 S.D. 507, 67

N.W. 57, 32 L.R.A. 315; Henderson v. Ogden City Railway Co., 7 Utah 199, 26 P. 286, are cases dealing with the same Act of Congress, and both reject the interpretation of the Act which appellants urge upon us here. Certainly the assertion that the provisions of the Alaska statutes authorizing the Commission and the City Council to grant exclusive certificates and franchises, are null and void, presented a grave problem to the trial judge and one which, to say the least, required much time for study and consideration. The position taken by the appellant on this point is so doubtful that we think the trial court could not properly accept its argument without careful investigation and extended consideration.

There was also an important question as to whether Matanuska was not entitled to an injunction even if its certificate was not an exclusive one. That would be particularly true if Anchorage Bus was without a valid certificate of its own. See Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L. Ed. 483; Wichita Transportation Co. v. People's Taxicab Co., 140 Kan. 40, 34 P. 2d 550, 94 A.L.R. 771; Puget Sound Traction, Light & Power Co. v. Grassmeyer, 102 Wash. 482, 173 P. 504, L.R. A.1918F, 469; Adam v. New York Trust Co., 5 Cir., 37 F.2d 826. Furthermore, there appears to be substantial authority for the proposition that the holder of a non-exclusive public utility franchise who is first in the field may enjoin the second and later holder of a franchise who threatens competition which seriously or unnecessarily interferes with the first holder's property or operations. See the cases collected in the Note and Annotation, 119 A.L.R. 432.

As we have indicated in the statement of facts here, Anchorage Bus received a temporary certificate from the Commission on December 21, 1955. If the plain-

4. Substantially the same language was incorporated in the Alaska Organic Act of 1912, 37 Stat. 514, see Title 48 § 77, where in stating certain restrictions imposed by the territorial legislature, it was said: "Nor shall the legislature grant to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise without the affirmative approval of Congress."

tiff's certificate of convenience and necessity dated September 17, 1949, was an exclusive one, as it purported to be, the issuance of the temporary certificate would constitute no bar to plaintiff's injunction.[5]

But there is a further difficult question presented here, and not an easy one, namely, whether the temporary certificate was valid.

The statute (see footnote 1, supra) contemplates the issuance of such a certificate only to provide for service between points "having no carrier service capable of meeting such need." As has been indicated, there was enough reason to believe that the Commission issued the temporary certificate under a misapprehension and a belief that an emergency existed. The certificate so shows on its face.[6] The communications of the commanding officer had led the Commission to believe that Matanuska could not operate. However, it actually never ceased operating, and the court was justified in assuming that no emergency of the kind contemplated by the statute had arisen; —hence, that the conditions upon which the Commission might issue the certificate were non-existent.[7]

In suggesting as we have done here that the trial judge was confronted with serious and thorny questions for decision in this case, we are not undertaking to decide how those questions should ultimately be resolved. As this court had occasion to say in Trautwein v. Moreno Mut. Irr. Co., 9 Cir., 22 F.2d 374, 376, a case quite similar to the present one, "[B]ut those are all questions for consideration when the case is heard on the merits. On the present hearing, the courts are only concerned with the single question: Did the plaintiffs make out a prima facie case?"

■ Further pursuing the inquiry suggested by the Supreme Court's statement, supra, in Ohio Oil v. Conway, it should be noted here that the injury to plaintiff would be certain and irreparable if the application for an injunction would be denied and the final decree be in its favor. Matanuska was the owner of a long established business thoroughly integrated and serving an immense area in that portion of Alaska, an area with a population in excess of 100,000. We know judicially, as the district court knew, that final determination of the issues presented in the case would come only after long delay because of the condition of the court calendars in Alaska. Without an injunction Matanuska would have no adequate remedy against Anchorage Bus which was a newcomer with a smaller and very limited investment and nothing but an expectancy in the way of a business. The injunction was issued upon condition that the defendant be indemnified by a bond and the amount

---

5. Under the authorities listed in the note and annotation cited above, even if plaintiff's certificate were non-exclusive, yet since it was the first one, it might procure an injunction against the defendant even though the latter had the temporary certificate.

6. The certificate recites that Matanuska "has been denied access to the said military installations."

7. A further question as to the validity of the temporary certificate is presented by the language of § 2(e), supra. There, the Commission's power to issue certificates is set forth as follows: "(e) Issue certificates of convenience and necessity, conformable to the provisions of this Act as hereinafter set forth. This authority shall include the discretion to issue exclusive certificates on such routes and upon such conditions as the Commission deems necessary or advisable in the public interest to secure continuous, efficient and dependable bus services in the affected areas, *provided that in making such determinations with respect to routes partly within and partly without incorporated towns, an order for issuance of a certificate shall not be final until concurred in by the city council or councils of the affected town or towns by a majority vote of the members to which such bodies are entitled.*"

The portion we have emphasized is significant, for the City of Anchorage was incorporated, it never approved any operation by Anchorage Bus, and the certificate purported to authorize operation within the City to the City bus terminal.

of the bond required was in an amount substantially equal to the defendant's total investment. The injury to the latter from the injunction, even if the final decree went in its favor, would obviously be inconsequential.

It is our opinion that in issuing the temporary injunction the court was following the rules applicable in such cases as Ohio Oil v. Conway, supra; Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189, and Prendergast v. N. Y. Tel. Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 83. Cf. High on Injunctions, 4th Ed. § 1510.

■■ Anchorage Bus has undertaken to urge in its brief here a number of other points which we think have no bearing upon the substantial issues in the case. Thus it complains that the trial court failed to consider its contention that the Commission improperly suspended its certificate of October 21, 1955. It is our view that the suspension was within the power of the Commission but that the right to present this contention was waived at the hearing in the court below.[8]

It is also argued that the court was in error in granting a temporary restraining order pending the hearing on the temporary injunction. As we have held that the temporary injunction issued after hearing was properly granted, it necessarily follows that the temporary restraining order was an appropriate step preliminary to that injunction.

The temporary injunction order appealed from is affirmed.

LEMMON, Circuit Judge (dissenting).

We have frequently adverted to the weight that courts should accord to findings and decisions made by administrative boards in the exercise of what Mr. Justice Frankfurter is fond of calling "expertise."[1]

Once again we are faced with an attempt by a trial court to interfere, this time by injunction, with the activities of a public utility operating under a certificate lawfully granted to it by a regulatory commission.

In its brief, the appellee ascribes to the appellants a "monstrous contention that an existing public transportation system, franchised and licensed in accordance with law and serving a large and vital area under difficult conditions, is defenseless in a court of equity against the depredations of a group of adventurers out to make a quick dollar by pirating a few lucrative routes," etc.

I deplore the use of such immoderate language, for which there is not a shred of support in the record.

The District Court issued a preliminary injunction restraining the appellants from interfering with the appellee's franchises, certificates of public convenience and necessity, etc., issued by the Territory of Alaska, etc.; and from operating a bus transportation system over Territorial streets in Anchorage, Alaska, and also over highways connecting Elmendorf Air Force Base and Fort Richardson Military Reservation and the City of Anchorage.

8. When the legality of the suspension was under discussion the following colloquy took place between the court and counsel for appellants: "The Court. In that respect, Mr. Butcher, I do not feel it is controlling in an injunctive proceeding, and, therefore, that would be a collateral matter to be tried before the court at this time, which I do not feel would be proper. I think that the case itself should stand or fall upon the merits of the cause of action which the [appellee] has at this time.
"Mr. Butcher. That is exactly our position, Your Honor."

1. See Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Far East Conference v. United States, 1952, 342 U.S. 570, 576, 72 S.Ct. 492, 96 L.Ed. 576.

From that preliminary injunction the present appeal has been taken.

1. The Amended Complaint

On October 25, 1955, the appellee filed a complaint against the appellants and others, containing, in summary, the following allegations:

The appellee is engaged in operating as a common carrier a motor bus or trolley bus service within the city limits of Anchorage, under the name of Anchorage City Transit System, as grantee under an exclusive twenty-year contract of franchise from the City of Anchorage, dated January 24, 1946.

The appellee also operates a motor bus service between its terminal in the City of Anchorage and Elmendorf Air Force Base, hereinafter Elmendorf, pursuant to a "transportation license" issued by the Department of the Air Force on October 21, 1952, effective for five years, or until October 12, 1957, and also pursuant to an "exclusive certificate of convenience and necessity" issued by the Alaska Bus Transportation Commission, hereinafter the Commission, on September 17, 1949, applicable to the connecting routes between the appellee's terminal in the City of Anchorage and Elmendorf.

The appellee also operates a motor bus service between its terminal in Anchorage and Fort Richardson Military Reservation, hereinafter Richardson, "pursuant to oral authorization by the appropriate authorities and for which an application for a transportation license is now pending," and pursuant further to an "exclusive certificate of convenience and necessity" issued by the Commission on September 17, 1949, applicable to the connecting routes between the appellee's terminal in Anchorage and Fort Richardson. That certificate was still in effect when the suit was filed.

The appellants and other defendants below who have not appealed are interfering with the appellee's rights, franchises, etc., by seeking "to induce the breach, termination and abrogation of the said contracts, and by spreading malicious rumors concerning the validity and existence thereof," etc., thus causing irreparable damage to the appellee's business, "all to the end that great and irreparable damage to the public interest in continued adequate transportation may result," etc.

The Commission is alleged to have issued a certificate of public convenience and necessity to the appellant Anchorage Bus Company, Inc., hereinafter Anchorage Bus, covering the connecting routes between Anchorage and Elmendorf and between Anchorage and Richardson, in violation of the appellee's "aforesaid exclusive franchise and certificate, without notice or opportunity to be heard first given to [appellee] and contrary to the provisions * * * of applicable Territorial law; issuance of the said certificate to the appellant Anchorage Bus and operation thereunder by Anchorage Bus in competition with the appellee threatens to cause irreparable damage to the appellee by depriving it of the only revenue providing portion of its integral public transportation system, contrary to the public interests," etc.

A second cause of action alleges publication in two Anchorage daily newspapers of certain statements alleged to have been defamatory. The present appeal is not concerned with this second cause of action.

The complaint closes with a prayer that the appellants be enjoined "during the pendency of this action, and permanently, from interfering" with the appellee's contracts, franchises, etc.; that the appellee have judgment against the appellants for $250,000; and that the defendant Commission members be enjoined from seeking to abrogate the appellee's exclusive certificate of public convenience and necessity "except after due notice and proper hearing," etc.; that the Commission be ordered to suspend, during the pendency of this action and until final determination on the merits can be made, "any certificate of public convenience and necessity" issued by it to Anchorage Bus, in violation of the appellee's certificate and franchise; and that the Commission be ordered to show cause why they should not grant a public hearing to the appellee and An-

chorage Bus to determine whether public convenience and necessity require the cancellation of the said certificate issued to Anchorage Bus.

2. Statement of Facts

The appellee held a certificate of public convenience and necessity issued on September 17, 1949, by the Commission, in which it was "exclusively authorized" to provide bus transportation service in and over highways within the Territory from the two bases to the City and return.

Appellee also possessed an exclusive twenty-year franchise, granted by the governing body of the City and approved by the electorate of the City, to operate a bus service picking up and discharging passengers on the streets of the City of Anchorage and adjacent areas, under the name of Anchorage City Transit System. This franchise was granted by an ordinance dated January 24, 1946.

Finally, the appellee on October 21, 1952, was granted by the Department of the Air Force a license to operate a motor transportation service on Elmendorf, from October 13, 1952, to October 12, 1957. This license was revocable at will by the Secretary of the Air Force, and stipulated that the privilege therein granted was not to be "construed to prevent the furnishing of transportation service by such other persons or companies as may be authorized by the Secretary of the Air Force."

On June 10, 1955, Anchorage Bus was awarded a contract by the combined Army and Air Force Exchange to operate a bus transportation service on Elmendorf and Richardson, replacing the appellee, which for several years had been furnishing this same service under a license. The Court below found that the appellants "were prepared, ready, and about to commence operation in direct competition with [appellee's] said transportation system over the public highways * * * of the Territory * * * and Anchorage, between points on said Military Bases and * * * Anchorage."

On October 21, 1955, the Commission issued to Anchorage Bus a certificate of public convenience and necessity to furnish motor bus transportation between Elmendorf and Fort Richardson, on the one hand, and the Bus Terminal in the City of Anchorage, on the other.

On October 25, 1955—the same day on which the complaint herein was filed, *supra*—the Commission suspended the certificate issued to Anchorage Bus "on October 17, 1955." [2] The reason given for the suspension was that the appellee had protested that it had not been granted an opportunity to appear at the hearing. The Commission's order also recited that "certain bus service" rendered by the appellee would "be interfered with and possibly discontinued because of the alleged financial difficulties caused by the granting of the said Certificate to [Anchorage Bus], which if substantiated will be to the detriment of the public interest."

In the same order, the Commission decreed that a public hearing be held on December 6, 1955, to inquire (1) Why the certificate of "October 17," 1955, issued to Anchorage Bus should not be reinstated; (2) why the certificates [sic] issued to the appellee on September 17, 1949, should not be modified (a) to limit the number of bus routes and certificates issued therefor; and (b) to allow "concurrent operations" by other authorized bus companies, etc.

On October 31, 1955, the court below issued a temporary restraining order prohibiting the appellants from interfering, etc., with "the exclusive Territorial and municipal franchises" of the appellee, and from operating any public bus service on the public highways and streets of Anchorage or between Anchorage and Elmendorf or Richardson, etc. The appellee was required to give a $10,000 bond.

On December 14, 1955, the Commission announced that it was convinced

2. The copy of the certificate itself contained in the transcript in this appeal gives the date of the certificate as October 21, 1955, as stated herein, *supra.*

that it was "physically possible" for the appellant Anchorage Bus "to travel and transport passengers from Elmendorf * * * and Richardson non-stop to a bus terminal on private property in * * * Anchorage * * * without traversing any Territorial roads," and that therefore the Commission was "of the opinion that it is possible for * * * Anchorage Bus * * * to operate * * * without the necessity of securing * * * a Certificate of Public Convenience and Necessity."

At a meeting of the Commission held on December 21, 1955, there was read a telegram from Colonel Louis E. Coira, commander of the 5039th Air Base Wing, at Elmendorf, stating that the appellee's liability policy was considered "absolutely insufficient insurance coverage for operation within military reservation." The telegram also referred to "past deletion of routes on base without notice and past and present lack of adherence of trip schedules," which it was charged impeded "arrival and departure of Air Force personnel and civilian employees, seriously affecting operation and morale."

"For these and other pertinent reasons," the telegram continued, "Air Force Secretary has been requested to give permission to cancel license of that carrier [appellee] covering operations within military reservation. Upon receipt of permission, [appellee] will be notified that its license is cancelled, and authorization for operation by it of any public transport within reservation will be terminated.

"This will create great hardship unless you authorize operation between City of Anchorage and military bases by another carrier. Present insurance, equipment and on-base service by Anchorage Bus * * * considered entirely adequate and satisfactory. Brief operation between Elmendorf * * * and Anchorage by Anchorage Bus * * * indicated service adequate to meet requirements of the military."

Accordingly, the Commission announced its formal decision to the effect that at its hearing on December 15th [sic],[3] it had refrained from hearing "the testimony of Anchorage Bus * * * it did so with the thought that the action and the decision made at that hearing would release * * * Anchorage Bus * * * from the restraining order [supra] which was then in effect"; that "At least a majority of the Commission would not have terminated the hearing without allowing * * * Anchorage Bus * * * to complete its case if they did not feel that this would be the result"; and that therefore, the Commission, "after reconsidering the evidence presented at the hearing in Anchorage on the aforesaid date grants * * * Anchorage Bus * * * a temporary certificate * * * to cover the highways traversed between the terminal in Anchorage on 5th Street to * * * Richardson and Elmendorf. * * * * "

A temporary certificate of public convenience and necessity, bearing the same date as that of the meeting just referred to,—December 21, 1955—was issued to Anchorage Bus. The certificate recited that the appellee had "been denied access to the said military installations, all to the detriment and inconvenience of those members of the public who work, reside or are stationed at the said military installations"; and that "the Elmendorf * * * Commanding Officer has specifically requested that the said Anchorage Bus Company be preferred and authorized to operate between * * * Anchorage and the said Air Force Base for reasons of military operations and morale, * * * * "

The routing indicated in the certificate was substantially the same as that outlined in the decision, *supra*.

On the following day, a letter was sent by Colonel Coira to Russell Swank, the appellee's vice president and general manager, stating that the appellee's liability insurance, "covering injury to per-

---

3. As already indicated herein, the transcript before this court shows the date of the previous hearing to have been December 14, 1955.

sons which arise [sic] in the operation of your bus transportation service is inadequate. This policy was not approved in this headquarters as required by your license to operate on this installation."

The letter also stated that the authority granted to the appellee on October 15, 1952, to operate on Elmendorf (the record before us shows that it was signed on October *21*, 1952, *supra*) was suspended effective on the conclusion of the appellee's "presently scheduled runs of 27, December 1955". Colonel Coira also stated that the extending of a new license for motor transportation service on Elmendorf would be considered "Upon future demonstration to us of your financial responsibility and evidence that you carry adequate liability insurance."

The record shows that December 23, 1955, a general insurance agency informed the appellee that, effective December 27, 1955, the latter's liability insurance had been written "with limits as required by the Territory of Alaska namely: $50,000/200,000 Bodily injury, $5,000 Property Damage plus $2,500 Property Damage from any cause for passengers' property".

In this connection, it should be pointed out that on this appeal the right of the appellee to operate *within* the boundaries of either Elmendorf or Richardson is not pertinent to the issue, since the preliminary injunction specifically provides that "nothing herein contained shall be construed to prohibit the normal operations of the [appellant] within [such] boundaries * * *"

On January 16, 1956, the District Court issued the preliminary injunction appealed from, embodying in general the terms of the temporary restraining order, *supra*, but fixing the appellee's bond at $40,000.

3. The District Court's Findings and Injunction

The court found that the appellee was furnishing an integrated motor bus transportation system under the name of Anchorage City Transit System, pursuant to a franchise issued by the City of Anchorage, a certificate of public convenience and necessity issued by the Territory of Alaska, and a license or licenses issued by the military authorities; that this system was integrated with connecting carriers likewise operated by the appellee and its affiliates; that thereby it serves the entire area of South Central Alaska in the transportation of freight, mail, and passengers; that the appellants operate buses for hire, under contract with the Base and Post Exchanges at Elmendorf and Richardson, and between these two Bases, in competition with the appellee; that the appellants are preparing to commence operation in direct competition with appellee's transportation system over the highways, streets and alleys in the Territory and the City, between said Bases and the City; that the appellants do not hold a franchise from the City and do not have a permanent certificate of public convenience and necessity issued by the Territory, but only a temporary certificate; that the temporary certificate was issued improvidently and without a determination upon the merits; that the appellee has filed an appeal with the District Court from the issuance of the temporary certificate and that the appeal is still pending; that the appellants do not have any other franchise, license or permit for operation of a bus transportation system between the Bases and the City except the said contract with the Base and Post Exchange and the said temporary certificate; that appellee derives in excess of 70% of its gross revenue from the routes between the City and the Bases, and that the loss of these routes to the appellants would result in financial failure for the rest of appellee's bus transportation system and force cessation of its operations, contrary to the best public interest, convenience and necessity, and to the irreparable damage and injury of the appellee; that as a result of the appellants' operations, the appellee bus company has lost the services of a number of its employees and that other employees probably will leave as a result of the appellants' activities, unless restrained, and will seek to protect themselves against possible unemployment by accepting employment with the appellants, thus seriously disrupting the

operations of the appellee's transit system; that the temporary injunction would not seriously damage the appellants; that the Commission, charged by law with the administration of and having power to control common carrier service by bus in Alaska, has held hearings to resolve the entire controversy and to determine what course of action would be most beneficial to the public interest, which hearings have been recessed and not concluded and, according to the Commission's order, may be resumed only upon the request of Anchorage Bus, in the event that the latter still desires a certificate from the Territory; that a decision by the Commission will be subject to review by the District Court under Territorial law; that the rights and equities of the parties and the public interest must be protected in continued uninterrupted bus transportation; that continued, uninterrupted bus transportation will be best protected by preserving the *status quo*, thereby protecting the integrity and financial stability and ability to operate of the presently franchised and licensed carrier, the appellee.

The appellants are enjoined, pending the District Court's determination upon the merits of the action, from interfering with, breaching or violating in any manner, either directly or indirectly, any of the existing franchises, certificates of public convenience and necessity, licenses or transportation agreements of the appellee, issued by the Territory, the City, or the Department of Defense; from operating any bus or other motor vehicle as a public motor vehicle carrier for hire over the highways, streets, and alleys of the City or Territory, within the City, or between the Bases and the City; but, as we have seen, exempting from the injunction the operations of Anchorage Bus *within* the boundaries of the Bases.

### 4. The Questions Presented

Nowhere in their brief do the appellants set out, *eo nomine*, the "specification of errors" required by our Rule 18, subd. 2(d), 28 U.S.C.A. They have, however, included in the record a "Statement of Points on Which Defendants Will Rely on Appeal", and in their brief they have listed exactly one-half of the "fourteen separate points". Of those seven selected "points", we are informed that three have been consolidated into one. While all this does not amount to a technical compliance with our Rule, I believe that it amounts to a substantial compliance, and I would accept it as constituting the required "specification of errors". I do not, however, approve of such slipshod observance of our Rules.

The appellee, on the other hand, "contends that only the following issues are presented on this appeal:

"1. Did the Judge below abuse his discretion in granting the temporary restraining order and preliminary injunction?

"2. Do the pleadings and affidavits show sufficient equity in plaintiff's [appellee's] bill to permit the trial court to grant interlocutory relief for the preservation of the *status quo*, pending determination of the case on the merits?"

I adopt as my own the appellee's more concise statement of the equitable issues presented on this appeal.

### 5. The Failure of the Commission to Give the Appellants Notice of the Suspension Was Not a Material Error.

Before taking up these two main issues, there should be considered a "collateral" problem that comes into the case through the suspension of the appellants' certificate of public convenience and necessity. The appellants contend that this suspension, regardless of a specific provision of the certificate,[4] giving

---

4. "This Certificate of Public Convenience and Necessity with its conditions and limitations shall continue in full force and effect *so long as the Bus Transportation Commission determines that the Anchorage Bus Company, Inc., is at all times fit, willing and able properly to perform*

*the services above proposed and referred to,* and to conform to the provisions of the Act and the rules and regulations promulgated thereunder, and to properly service the public convenience and necessity at all times." [Emphasis supplied.]

the Commission considerable leeway in the matter of certificates, "was void and of no effect because it was issued without notice to appellants, as provided in subsection (c) of section 9 and it was made effective immediately, contrary to the provisions of subsection (d) of Section 9." The "Section 9" referred to is part of Chapter 93 of the 1949 Session Laws of Alaska, excerpts from which are copied in the margin.[5]

5. "Section 6. Certificates of Public Convenience and Necessity.

"(a) Except as allowed under Section 7, no common carrier by bus shall engage in transportation subject to this Act unless it holds a certificate of public convenience and necessity issued by the Commission; provided, however, that if any such carrier or a predecessor in interest was a bona fide operation as a common carrier by bus on January 1, 1947, over the route or routes or between the ports with respect to which application is made and has so operated since that time (or, if engaged in furnishing seasonal service only, was in bona fide operation during the seasonal period, prior to or including such date, for operations of the character in question) except, in either event, as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission as provided in subsection (b) of this Section and prior to the expiration of ninety days after this Section takes effect. Pending the determination of any such application, the continuance of such operation shall be lawful. If the application for such certificate is not made within ninety days after this Section takes effect, it shall be decided in accordance with the standards and procedure provided for in subsection (c), and such certificate shall be issued or denied accordingly. Any person, not included within the provisions of the foregoing proviso, who is engaged in transporation as a common carrier by bus when this Section takes effect may continue such operation for a period of ninety days thereafter without a certificate, and, if application for such certificate is made to the Commission within such period, the continuance of such operation shall be lawful pending determination of such application.

"(b) Application for a certificate shall be made in writing to the Commission, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission shall, by regulations, require.

"(c) The Commission shall issue a certificate to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if the Commission finds that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied.

"(d) Such certificate shall specify the route or routes over which, or the points to and from which, such carrier is authorized to operate, and, at the time of issuance and from time to time thereafter there shall be attached, to the exercise of the privileges granted by such certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require, including terms, conditions, and limitations as to the extension of the routs (route) or routes of the carrier, and such other terms, and conditions, and limitations as are necessary to carry out, with respect to the operations of the carrier, the requirements of this Act or those established by the Commission pursuant thereto; provided, however, that no terms, conditions, or limitations shall restrict the right of the carrier to add to its equipment, facilities, or service within the scope of such certificate, as the development of the business and the demands of the public shall require, or the right of the carrier to extend its services over uncompleted portions of highway projects hereafter completed.

"(e) No certificate issued under this Act shall confer any proprietary or exclusive right or rights in the use of public highways."

Section 9 of that Act is entitled "Notices, Orders, and Service of Process". Subsection (c) of Section 9 reads as follows:

"(c) The Commission may suspend, modify, or set aside its orders under this Act upon such notice and in such manner as it shall deem proper."

Although we believe that Subsection (c) of § 9 of the act of 1949, *supra,* gives the Commission considerable leeway to "suspend" its orders "upon such notice and in such manner as it shall deem proper", it seems to me that counsel for the appellants himself waived any irregularity, if there was irregularity, in the Commission's order of suspension. The main opinion correctly adverts to this.

In any event, on December 21, 1955, the Commission, as we have seen, issued to the appellant Anchorage Bus a certificate of public convenience and necessity. As the appellants themselves state in their brief, it was "armed" with *that* certificate that the appellants moved the court to dissolve the preliminary injunction.

I turn now to that ultimate question.

6. The Appellee's Dilemma: Either Its Certificate Purported to Give an Exclusive Franchise, and Was Therefore Invalid—

The appellee concedes that "we have a complex fact situation". Ordinarily, questions of fact, in a matter of this kind, should be left to the "expertise" of the administrative body skilled and experienced in that area.

It is earnestly pressed upon us, however, that "two Territorial statutes, one * * * applicable to the Territorial and the other to the Municipal franchise", buttress the appellee's "valuable property right".

The first is § 2(e) of Chapter 93 of the Session Laws of 1949, supra, which reads as follows:

["The Commission shall:]

\* \* \* \* \* \*

"Issue certificates of convenience and necessity, conformable to the provisions of this Act as hereinafter set forth. This authority shall include the discretion to issue *exclusive certificates* on such routes and

upon such conditions as the Commission deems necessary or advisable in the public interest to secure continuous, efficient and dependable bus services in the affected areas, \* \* \*." [Emphasis supplied.]

The other statute is Chapter 91 of the 1949 Session Laws of Alaska, which amended § 16–1–35 of the Alaska Compiled Statutes Annotated, Volume 1, to read as follows:

"[The council shall have and exercise the following powers:]

"Section 1. \* \* \* Sixteenth: Franchises. To grant franchises, *including exclusive franchise privileges,* for the construction, operation and maintenance of \* \* \* bus transportation systems \* \* \* and to permit the use of streets and other public places for a period of not to exceed twenty years, under such rules and regulations as may be prescribed by ordinance. \* \* \*

"Section 2. *Exclusive franchises* heretofore approved by not less than fifty-five percentum of the votes cast at any municipal election wherein the people approved an exclusive franchise within said municipality are hereby ratified and given full force and effect under this Act provided the terms of said franchise intend that the same shall not be in force and effect." [Emphasis supplied.]

Such enactments by the Territorial Legislature contravene a specific Congressional mandate contained in 48 U.S.C.A. § 77:

" \* \* \* nor shall the legislature [of Alaska] grant to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise without the affirmative approval of Congress; \* \* \* and all laws passed, or at-

Subsection (d) of Section 9 follows:
"(d) Except as otherwise provided in this Act, all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, as the Commission may prescribe and shall

continue in force until its further order, or for a specified period of time, according to provisions of the order, unless the same shall be suspended, modified, or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction."

tempted to be passed, by such legislature in said Territory inconsistent with the provisions of this section * * * shall be null and void."

Again, 48 U.S.C.A. § 1471 reads in part as follows:

"*Local or special laws*

"The legislatures of the Territories of the United States now or hereafter to be organized shall not pass local or special laws in any of the following enumerated cases, that is to say:

* * * * * *

"Granting to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever.

"In all other cases where a general law can be made applicable, no special law shall be enacted in any of the Territories of the United States by the Territorial legislatures thereof."

See also In re O'Harra Bus Lines, Inc., 1948, 12 Alaska 129.

These two next preceding statutes make it abundantly clear that a Territorial legislature in general, and the Alaska legislature in particular, may not grant an *exclusive* franchise to a bus company without the affirmative approval of Congress—which approval is of course absent in the instant case.

In striving to explain away the above two Congressional provisions, which on their face destroy the appellee's case, the appellee takes somewhat inconsistent positions. It first concedes that "the quoted language * * * does limit the power of the Territorial Legislature to grant exclusive franchises, by making such exclusive grant *subject to the affirmative approval of Congress*." [Emphasis the appellee's] With this statement I unreservedly agree.

On the next page of its brief, however, the appellee qualifies this concession to plain logic, by asserting:

"The only possible conclusion to be drawn from a combined reading of these two provisions is that Congress intended to prohibit the Territorial Legislature from granting exclusive franchises of *Territory-wide* application, except with the affirmative approval of Congress. Nor can the Territorial Legislature grant locally restricted but exclusive franchises by the enactment of local or special laws, but is confined to the promulgation of general laws for this purpose," etc., etc.

On the ensuing page, the brief further develops this "Territory-wide" limitation idea:

"The logic of this interpretation is appealing and is historically sound. Clearly the granting of an exclusive Territory-wide franchise by the Legislature is a matter of such wide import that the Congress of the United States, in view of the limitations placed upon Territorial governments, has properly reserved to itself the right to take final action in such matters. At the same time Congress clearly did not desire to retain unto itself, nor did it intend thereby to prohibit to the Territories, the exercise of exclusive franchising powers on the *local* scene, either directly by the Legislature or through delegation, except insofar as it imposed a general prohibition against the enactment of local or special legislation, which also applies to a number of other cases."

[Emphasis again the appellee's]

I find the appellee's argument confusing and inconsistent. First we are told that "the power of the Territorial Legislature to grant exclusive franchises [is] * * * *subject to the affirmative approval of Congress*.

Next we are told that the prohibition applies only to the Legislature's grant of *Territory-wide* exclusive franchises.

But it may not "grant locally restricted but exclusive franchises by the enactment of *local* or special laws", but only by general laws.

Again, the argument is that Congress did not intend "to prohibit to the Territories, the exercise of exclusive franchising powers on the *local* scene, either directly by the Legislature or through delegation * * *"

Finally comes the crowning inconsistency, in the same sentence:

"* * * except insofar as it imposed a general prohibition against the enactment of local or special legislation," etc.

In other words, (1) the Legislature may not grant exclusive franchises, in general, without the approval of Congress. (2) It may not grant exclusive franchises of "Territory-wide application only". (3) It may not grant exclusive franchises by enacting *local* or special laws but may do so by "general" laws. (4) The Legislature may "exercise * * * exclusive franchising powers on the *local* scene, either directly * * * or through delegation." (5) But it may not do so by the enactment of local or special legislation". (Query: How else *can* the Legislature "exercise * * * exclusive franchising powers on the *local* scene" *except* by "local or special legislation"?)

I have thus expatiated upon this quintuple inconsistency of the appellee because I believe that such inconsistency of itself betrays the weakness of the appellee's frantic efforts to escape the plain Congressional mandate:

The Legislature shall not, either directly or indirectly, grant special or exclusive franchises, absent the affirmative approval of Congress.

Nor do I agree with the appellee's argument that, while "the Territorial Legislature [cannot] grant locally restricted but exclusive franchises by the enactment of *local* or special laws", it may promulgate "general laws for this purpose * * * which grant the power to authorize *locally exclusive* franchises to cities as well as to the Territorial Bus Commission". The appellee's theory would enable the Legislature to "delegate"—that is the word used by the appellee elsewhere in this connection—power that it did not itself possess. Under such a paradoxical concept, the creature would have greater power than the creator!

The mere statement of such a proposition demonstrates its fallacy. It would enable the Territorial Legislature to do indirectly what it cannot do directly, thus disregarding the salutary maxim, *Qui facit per alium facit per se.*

7. —or the Appellee Did Not Have an Exclusive Franchise, in Which Case the Appellants Could Not Be Enjoined from Operating.

If the appellee has a certificate of public convenience and necessity that is not exclusive, and the appellants now possess a valid certificate, as I believe they do, then the appellants have the same right to operate as the appellee has.

In that event, the appellee is not entitled to an injunction, preliminary or permanent.

The above propositions are so self-evident that they do not require to be buttressed by citation of authorities.

In its brief, however, the appellee digests a number of cases in an attempt to support its contention that "even in the absence of an exclusive franchise," a public utility "has a right * * * to be protected against interference with its operations, property or plant by a competitor". But every one of the appellee's own summaries show that relief was granted in those cases because there was an "unlawful" operation of competing taxicabs or that there was "the operation of a competing bus line which was not licensed"; or an "operation of jitney buses * * * in violation of an ordinance"; or "the operation * * * of jitney buses, without permit or license from the city or town"; or that taxicabs "were being operated in violation of an ordinance".

I have no quarrel with these cases. They simply are not in point.

Similarly, the appellee cites 119 A.L.R. 432–456, which likewise is not in point. This may be seen at once from one of the opening sentences:

"The present annotation, * * * is concerned not with the consequential effects of mere competition, but with direct interference with property or the use thereof. Questions in reference to the right of a public utility operating under a franchise or other sufficient authority to pro-

tection against unlawful competition by one having no valid franchise or permit are not dealt with herein."

It will thus be seen that the above annotation does not deal with relief against even *unlawful* competition, which I believe does not exist in the instant case. Nor is there charged here that there was "direct interference with property or the use thereof". Neither is the preliminary injunction concerned with such interference.

The able District Judge evidently considered himself the arbiter of the city's transportation interests. This is shown by the following language used by the Court:

"Well, the court must consider the entire transportation system of the area, which means within the City of Anchorage proper as well as that contiguous to the City of Anchorage and not exclusively the City-Military segment, and, based upon the facts in evidence and arguments of counsel that the court has before it at this time the motion to dissolve the preliminary injunction is hereby denied for the reason that the ground given by the defendants is not sufficient in equity."

I do not so regard the Court's duty. The Court should have limited itself to a consideration of the legal and equitable rights of the parties, not the public convenience and necessity. The latter problems were entrusted to the discretion and "expertise" of an administrative body especially created for that purpose—the Alaska Bus Transportation Commission.

In Honolulu Rapid Transit & Land Company v. Territory of Hawaii, 1908, 211 U.S. 282, 290–291, 29 S.Ct. 55, 57, 53 L.Ed. 186, the Court said:

"The business conducted by the transit company is not purely private. It is of that class so affected by a public interest that it is subject, within constitutional limits, to the governmental power of regulation. This power of regulation may be exercised to control, among other things, the time of the running of

cars. *It is a power legislative in its character, and may be exercised directly by the legislature itself.* But the legislature *may delegate to an administrative body* the execution in detail of the legislative power of regulation." [Emphasis supplied.]

The correct rule is thus stated in 28 Am.Jur., Injunctions, § 162, page 352:

"Equity will not attempt by injunction to substitute its own discretion for that of [public] officials in matters belonging to the proper jurisdiction of the latter."

Again, in op. cit., § 168, page 358, we find the following:

"*Government Departments and Executive Officers.*—The judiciary may not encroach upon other departments of the government nor will it, as a rule, interfere with performance by them of their constitutional functions."

I do not think that the appellants, as co-holders with the appellee of non-exclusive public transportation privileges, could be restrained by injunction from the enjoyment of those privileges.

8. Conclusion

The horns of the appellee's dilemma are as follows:

(1) Either its certificates of public convenience and necessity purported to give it the exclusive right to operate buses between the City of Anchorage and the two military reservations, and therefore were unlawful, as contravening a Federal statute; *or*

(2) The appellee's certificates were not exclusive and therefore did not entitle it to an injunction restraining the appellants from operating buses along the same routes.

Whether the appellants were entitled to certificates of convenience and necessity was a matter to be determined by the Alaska Bus Transportation Commission, in the lawful exercise of its administrative "expertise".

Accordingly, I think that the case should be remanded to the District Court, with instructions to dissolve the preliminary injunction.