Sidney J. MUELLER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17293.

United States Court of Appeals
Fifth Circuit.

Dec. 23, 1958.

Seymour Lieberman, Houston, Tex., for appellant.

Charles C. Moore, Jr., Washington, D. C., John H. Baumgarten, Asst. U. S. Atty., William B. Butler, U. S. Atty., Houston, Tex., for appellee.

Before TUTTLE, JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Sidney J. Mueller appeals from a judgment in favor of the United States in an action by the United States to recover penalties for Mueller's violation of a cease and desist order of the Federal Trade Commission.[1] We affirm.

Sidney J. Mueller, Hair Expert,[2] had a sure-fire recipe for a profitable business. He could make hair grow where before there was only fuzz. He could thicken hair, rejuvenate the growth function of hair, and banish baldness. He could energize the scalp. He could kill bacteria beneath the scalp. He could eliminate forever one's dandruff, itchy scalp, dry scalp and oily scalp. Or so he represented. And so he advertised. Unfortunately for Mr. Mueller, in 1952 the Federal Trade Commission ordered him to cease and desist from "disseminating or causing to be disseminated by means of the United States mails or by any means in commerce" any advertisement containing such representations.[3]

1. The action is authorized by Sections 5 (*l*) and 16 of the Federal Trade Commission Act, 15 U.S.C.A. §§ 45(*l*), 56.

2. Mueller carried on his business under the name "Mueller Hair Experts".

3. The cease and desist order reads in part:

"It Is Ordered that the respondent Sidney J. Mueller, an individual trading as Mueller Hair Experts or under any other name, his representatives, agents and employees, directly or through any corporate or other device, in connection with the offering for sale or sale of treatments of the hair and scalp in which the various cosmetic and other preparations, as set out in the findings herein, are used; or in connection with the sale, offering for sale or distribution of the various cosmetic and other preparations as set out in the findings herein, for use in the treatment of conditions of the hair and scalp or of any other preparations of substantially similar composition or possessing substantially similar properties, do forthwith cease and desist from:

"I. Disseminating or causing to be disseminated by means of the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, any advertisement which represents, directly or by implication:

"(a) That the use of said preparations by purchasers in their homes, or

At the time the order was issued Mueller had offices in six states and shipped considerable merchandise (cosmetics and home treatment kits) across state lines. Mueller consented to the order and after its issuance closed all of the offices not located in Texas.[4] In Texas he continued to maintain offices in Houston, Dallas, Fort Worth, and San Antonio. His method of doing business, however, was substantially the same as it was before the cease and desist order: Mueller Hair Experts sold scalp and hair preparations directly to the consumer for home use and also gave treatments at the office, the "trichologists" using the same preparations sold for home use.

After the cease and desist order, Mueller advertised only in Texas papers. Sixteen advertisements are in the record. These are engaging: "It's never too late to save your hair"; "There but for Mueller go I"; "After worrying about baldness for 5,354 years, man learns to *Make Hair Grow*"; "Save Your Hair Week Starts Tomorrow". Five of the advertisements referred to special home treatments for people who live out-of-town or travel. Mueller mailed no newspapers and shipped no cosmetics out of Texas. The publishers circulated their newspapers outside of Texas in part through the United States mails.

The facts were stipulated. The district court found that the advertisements in the record violated the Commission's cease and desist order and rendered judgment for the United States in the amount of $8000. We agree with the district court.

## I.

■ Mueller contends that *he* did not disseminate the advertisements; the newspaper publishers did. Mueller contends that the government stipulated itself out of court in agreeing that "Defendant did not buy, sell, or ship the various cosmetics or other preparations in question, or *anything else* outside the state" and that the "newspapers were distributed by said publishers of said newspapers through the United States mail and to points outside the State of Texas".

---

that treatments of the hair or scalp by respondent or his operators in which the various cosmetic and other preparations set forth in the findings are used, or in which any other preparations of substantially similar composition or possessing substantially similar properties are used, will:

"(1) Have any effect in preventing or overcoming baldness,

"(2) Cause hair to grow thicker in spots where it is thin,

"(3) Cause 'fuzz' to be replaced by normal hair,

"(4) Cause the hair growing functions of the scalp to be rejuvenated,

"(5) Kill bacteria beneath the scalp,

"(6) Cause the scalp to be energized to grow new hair,

"(7) Cause the permanent elimination of dandruff, itching, dryness or oiliness of the scalp,

"(8) Cure all scalp disorders, keep the hair healthy or enable an individual to maintain a thick head of hair;

"(b) That respondent's preparations are dissimilar to preparations used by competitors,

"(c) That respondent's preparations are the result of discoveries made during the last war, or discoveries of recent years.

"II. Disseminating or causing to be disseminated by any means, any advertisement for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of said preparations in commerce, as 'commerce' is defined in the Federal Trade Commission Act, which advertisement contains any of the representations prohibited in subparagraphs (a) through (c) of Paragraph I hereof or which represents, directly or by implication, that respondent or any of his employees who have not had competent training in dermatology or other branches of medicine having to do with the diagnosis and treatment of scalp disorders affecting the hair are trichologists, or hair scientists, or that respondent has, or has had, experts in chemistry in his employ."

4. In 1953, after the cease and desist order was entered, Mueller's attorney met with the attorney for the Federal Trade Commission to advise him that Mueller was no longer engaged in interstate commerce; and, citing cases, that mere crossing of state lines by newspapers did not put the advertiser in interstate commerce.

"Anything else", Mueller argues, includes newspapers.

The weakness in this argument is the assumption that the Federal Trade Commission Act and order are applicable only if the false advertising is disseminated by the defendant himself. The cease and desist order, however, applies to the defendant "causing [the advertisements] to be disseminated". This language tracks the Act. Section 12(a) of the Act, 15 U.S.C.A. § 52(a), provides:

"It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

"(1) By United States mails, or in commerce by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; * * *."

Shafe v. Federal Trade Commission, 6 Cir., 1958, 256 F.2d 661, concerned false advertisements of O-Jib-Wa Bitters, a wondrous cure for a variety of ailments. Shafe claimed that in advertising in Michigan papers only and in restricting their sales to the state of Michigan, he was not subject to regulation by the Federal Trade Commission, which has no authority over purely intrastate transactions. Federal Trade Commission v. Bunte Bros., Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881. Compare: Chas. A. Brewer & Sons v. Federal Trade Commission, 6 Cir., 158 F.2d 74, 79. He argued that only a small percentage of the newspapers carrying their advertisements went into states other than Michigan and, in any event, such interstate delivery was the act of the newspapers and not the act of the petitioners. In Shafe v. F. T. C., 6 Cir., 1956, 256 F.2d 661, 664 it was held:

"Nor is it necessary that the false advertising be directly disseminated by the respondents. The statute

makes it unlawful for the respondents to cause such false advertising to be disseminated. Under these plain, unambiguous provisions of the statute, petitioners' contentions that they made no sale in interstate commerce and that they did not personally disseminate any false advertisement do not constitute a defense to the action."

We agree with this decision. Here it is immaterial that Mueller, himself, did not buy, sell or ship "anything" out of Texas. It is immaterial that the stipulation recited that Texas publishers circulated their newspapers in other states. Mueller was responsible for the advertisements being placed in the newspapers. That caused, resulted in, the advertisements being disseminated by United States mails.

■ The term "cause" is in the statute without any qualification relating to the advertiser's state of mind. It is unimportant therefore whether Mueller thought that he was not violating the cease and desist order and did not intend to come under federal jurisdiction.[5] The statute holds him liable for the natural consequences of his act regardless of his intentions. A contrary construction would blow the Act apart.

## II.

Mueller's second contention is that under the cease and desist order and Section 12 of the Federal Trade Commission Act (15 U.S.C.A. § 52) there is no federal jurisdiction since his advertisements applied only to intra-state sales and treatments. He contends that for federal jurisdiction to attach, the advertisements must induce the purchase of goods in interstate commerce.

■ The cease and desist order in this case consists of two paragraphs.[6] Paragraph I prohibits defendant from disseminating false advertisements "by

---

**5.** Mueller was not so naive as to think that Houston, Dallas, Fort Worth, and San Antonio papers are not circulated in appreciable numbers outside of those cities.

One of the advertisements in the Houston Chronicle was headed, "Special Home Treatment for Out-of-Town Clients".

**6.** See Footnote 2.

means of the United States mails" or in interstate commerce. Paragraph II prohibits the dissemination of the advertisements *by any* means * * * for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase" of Mueller's cosmetics in interstate commerce. Thus, under the first paragraph there is no necessity of an intent or likelihood of inducing interstate sales; under the second paragraph, such sales must be intended or likely.

■ This order is based directly on Section 12(a) of the Federal Trade Commission Act.[7] This section reads:

"Sec. 12(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

"(1) By United States mails, or in commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or

"(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in commerce of food, drugs, devices, or cosmetics."

Construing Section 12(a) in Shafe v. Federal Trade Commission, 6 Cir., 1958, 256 F.2d 661, 663, 664, the Court held:

"Under this section it is not necessary that there be a sale in interstate commerce. It is the dissemination of false advertising that the

statute is directed against. The use of advertising is well recognized as an integral part of the production and distribution of goods, and as such is subject to the regulatory powers of the Commission. * * * In addition, it will be noticed that Section 12(a) of the Act makes it unlawful to cause the dissemination of false advertisements by the United States mails irrespective of whether such dissemination is or is not in interstate commerce. It is settled law that congressional control of the mails, under the power conferred by the Constitution, includes the power to forbid the use of the mails for deceptive transactions which are detrimental to the financial well-being of the nation."

Federal jurisdiction attached because Mueller used the United States mails and also caused his false advertisements to be disseminated across state lines, for the purpose of inducing purchases in commerce. That was the offense Congress described in Section 12(a) (1). The offense does not depend on inducing purchases in interstate commerce.

### III.

■ Mueller's last stand is that he advertised treatments, not products; that the Act applies to products, not treatments.

When a man indulges in a shave in a barber shop he is buying a service (the barber's skill and time); he is not buying shaving cream and shaving lotion.[8]

---

**7.** Section 12(a) was added to the Federal Trade Commission Act in 1938. In holding the section constitutional, the Court held in American Medicinal Products, Inc. v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 426, 427: "The constitutional question attempted to be raised is lacking in substance. Petitioners have no constitutional right to disseminate false advertisements by the United States mails or by any means in commerce or by any means for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of their preparation in commerce. That Congress had power to pro-

hibit such dissemination cannot be doubted."

**8.** "A sale is complete when the drug is delivered whether hypodermically into the human system by the request of the buyer, or delivered elsewhere on his direction and does not need to be personally handled by the buyer." Ratigan v. United States, 9 Cir., 1937, 88 F.2d 919, 922. In Western Leather Company v. State Tax Commission of Utah, 87 Utah 227, 48 P.2d 526, repairing of shoes was also a sale of leather. In Swain, Nelson & Sons Co. v. Department of Finance, 1937, 365 Ill. 401, 6 N.E.2d 632,

We buy shoe shines not shoe polish. On the other hand, we purchase material as well as tailoring when we buy a tailored suit. Here, however, we do not have to draw any fine distinction between the sale of a service and the sale of a product along with a service. In this case the advertisements show that Mueller represented that the chief thing he had to offer was the miraculous effect produced by his cosmetic preparations. The sale of the office treatment was a transaction where an appreciable part of the consideration for the service was a payment for the material. In addition, Mueller sold directly to customers his cosmetics and home treatment kits. The Court found, and the finding is supported by the stipulation:

"Paragraph Two: In the course and conduct of his business, the respondent [appellant] for several years last past has been engaged in the sale and distribution of various cosmetic and other preparations for external use in the treatment of con-

___

landscaping was a sale of trees and shrubs. In Wilson v. Glander, 151 Ohio

ditions of the hair and scalp, including sales of such preparations through use of them in connection with treatments administered in his various offices."

Balding customers attracted to Mueller's Hair Experts had two choices. They could take treatments at the office, where Mueller's preparations would be applied—until in course of time all their hair fell out. Or they could buy the same preparation and give themselves treatments—until in course of time all their hair fell out. We think that for purposes of the Act there is no difference between the two choices, in the misrepresentation or in the purchases of the misrepresented product. Congress prohibited advertising such treatments when the advertising is disseminated in the United States mails or when it crosses state lines.

Judgment is

Affirmed.

___

St. 479, 86 N.E.2d 761, 763, recapping of tires was a sale of rubber.