**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

**SIMEON MANAGEMENT CORPORA-TION, a corporation, et al.**

**No. C-74-2226 WHO.**

United States District Court,
N. D. California.

March 11, 1975.

Calvin J. Collier, Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, James P. Timony, Atty., Federal Trade Commission, Washington, D. C., for petitioner; Raymond J. Lloyd, Regional Director, Alfred Lindeman, San Francisco Regional Office, Federal Trade Commission, San Francisco, Cal., of counsel.

Melvin K. Najarian, Josef D. Cooper, Cooper & Scarpulla, San ·Francisco, Cal., Marvin Gross, Los Angeles, Cal., Darrel P. Simpson, Medical Weight Loss, Inc., Los Angeles, Cal., Leo Shaw, Asaro & Keagy, San Diego, Cal., for respondents.

## MEMORANDUM OPINION AND ORDER

ORRICK, ·District Judge.

Sections 13(a) and (b) of the Federal Trade Commission Act (the Act), 15 U. S.C. § 53(a) and (b),[1] provide that the Federal Trade Commission (the FTC) may seek a preliminary injunction restraining the dissemination of advertisements whenever the FTC has reason to believe (1) that a person, partnership, or corporation is disseminating false or misleading advertisements or is violating or about to violate any provision of law enforced by the FTC and (2) that it would be in the public interest to enjoin the dissemination of such advertisements pending the issuance of an administrative complaint by the FTC and until there is a final administrative or court ruling on the complaint. The FTC is entitled to preliminary injunctive relief upon a proper showing that, *weighing the equities* and *considering the FTC's likelihood of ultimate success*, the granting of the injunction would be in the public interest.

---

1. Statutory references to the Act are to the applicable sections of Title 15, United States Code.

15 U.S.C. § 53 provides :

"(a) Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 52 of this title, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 45 of this title, and until such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission to cease and desist made thereon has become final within the meaning of section 45 of this title, would be to the interest of the public, the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States or in the United States court of any Territory, to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted without bond. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

(b) Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

In the case at bar, petitioner, the FTC, issued an administrative complaint against respondents on October 15, 1974.[2] In the administrative complaint, the FTC alleged that respondents were violating Sections 45 and 52 of the Act by disseminating false and misleading advertisements. The FTC now seeks a preliminary injunction restraining respondents from advertising their obesity and weight control treatments as long as respondents use the drug Human Chorionic Gonadotropin (HCG), or any other drug, in their treatment, and as long as HCG or such other drug has not been approved by the Food and Drug Administration (FDA) for use in weight reduction.

Respondents are corporations and individuals in the business of setting up, operating and promoting weight reduction clinics within (and in some instances outside of) the State of California. They provide management and support services to the licensed physicians and nurses who administer the treatments offered by the weight loss clinics. Respondents place advertisements for their clinics in newspapers, magazines, and on television.

The matter came on regularly for hearing on December 9, 1974. The Court having considered the pleadings, affidavits and briefs on file in this action and all the evidence, both oral and documentary as well as extensive oral argument, and good cause appearing, the motion for a temporary injunction is denied for the reasons hereinafter set forth. It is to be emphasized that nothing in this Memorandum Opinion and Order is to be taken as affecting in any wise the decision on the merits of the administrative complaint filed by the FTC. No doubt much more evidence from both sides will be presented at the hearings on the administrative complaint. Everything stated herein refers solely to the motion for a temporary injunction.

## I. STANDARD FOR INJUNCTIVE RELIEF

■■ In evaluating a motion for a preliminary injunction under the Act, the Court does not apply the traditional equity standards of judicial review. Section 53 of the Act permits the issuance of a preliminary injunction upon a proper showing that weighing the equities, and considering the FTC's likelihood of ultimate success, such action would be in the public interest. The statute does not define "proper showing" and there is sparse judicial interpretation of the requisites of a "proper showing". The legislative history of Section 53 makes it clear that since the FTC is a public agency, suing on behalf of the public, it is excused from making the traditional equity showing of irreparable injury. Joint Statement of the Committee Conference, H.R.Rep.No.93–617, 93d Cong., 2d Sess. (1973), page 31.

■ There is a split in judicial opinion whether the Court, in evaluating the motion for a preliminary injunction, need only determine that the FTC has reason to believe that the alleged violation has taken place (Federal Trade Commission v. Rhodes Pharmacal Co., 191 F.2d 744 (7th Cir. 1971) or whether the Court must also balance the equities. FTC v. National Health Aids, 108 F. Supp. 340 (D.C.Md.1952). Considering that the statute specifically directs the Court to weigh the equities and considering the extraordinary and important nature of injunctive relief, I am of the view that the District Court must do more than determine if the administrative agency had reasonable cause to believe that the alleged violation had taken place. Reasonable belief of a violation is enough to justify the FTC seeking a preliminary injunction, but in evaluating the motion for preliminary injunction the District Court must look to the FTC's reasonable cause to believe that a violation has taken place, *and* must also as a separate factor weigh the equities

---

**2.** The complaint was issued by a split vote of the Commission. Two of the five Commissioners voted against the issuance of the complaint.

in favor of granting or denying the preliminary injunction. FTC v. National Health Aides, *supra.*

## II. THE FACTS

The following facts are adduced from the evidence, both oral and documentary, taken at the hearing. They are generally applicable to all respondents and are pertinent for the purpose of deciding this motion for preliminary injunction. The operation of the clinics owned by the individual respondents vary in certain details from others, but such details are not significant in deciding this motion.

### A. *The Treatment Program*

Respondents' weight reduction clinics utilize the "Simeons" or "Simeon's" method for weight loss. The method consists of a four to six week treatment program of a 500 calorie diet, continuous medical counseling, and daily injection of HCG in a 125 I.U. dosage. HCG is a hormone or endocrine drug derived from the urine of pregnant women. HCG is marketed by a number of pharmaceutical houses and has been approved for the treatment of several conditions other than weight loss. For example, HCG is labeled for, and FDA approved for, use in the treatment of sterility due to anovulation, sterility due to hypogonadism, and for delayed onset of puberty. HCG has not been certified by the FDA for use in the treatment of obesity. However, HCG has been used for many years by physicians throughout the United States in the treatment of obesity.

Prospective patients of the clinics are sometimes given other drugs which are not approved by the FDA for weight reduction such as diuretics. The patients are not told that HCG or the other drugs employed lack FDA approval for the treatment of obesity or weight control.

The weight reduction treatment is administered by licensed physicians and nurses. Respondents only manage the clinics, they do not administer the treatments. On the initial visit to the clinic, a prospective patient is examined by a physician and given diagnostic tests to determine if the individual is eligible for the treatment program. Individuals suffering from diseases for which HCG is contraindicated are rejected from the program. If accepted into the program, the patient is placed on the diet and injection regimen. Dosages and frequency of injections are sometimes varied to suit the individual patient's needs.

The cost of the clinics' programs ranges from $100 to $300 for a course of treatment. Simeons Weight Clinics Foundation charges from $188 to $368 or more for their obesity treatment. Medical Weight Loss, Inc. charges $245 for their average obesity treatment. Bariatric Medical Clinics Management Corporation charges from $135 to $185 for their obesity treatment. Weight Reduction Medical Clinic charges from $170 to $240 for their obesity treatment. HCG Weight Clinics Foundation charges between $200 and $300 on the average for their obesity treatment. These average charges include the cost of various laboratory tests, a medical history, and the HCG injections.

The cost of respondents' obesity treatments is comparable to, or less than, charges by other private physicians or by university clinics for weight reduction treatments. Assuming a treatment program based on daily visits were available at other private or university clinics, the cost would be about $400 to $500.

### B. *The Advertisements*

Respondents advertise their weight loss clinics in magazines, newspapers, and on television. The advertisements suggest that the treatment method is safe, effective, and medically approved. The following are illustrative of the advertisements disseminated by respondents:

1. *Simeon Weight Clinics Foundation:*

Simeon Weight Clinics Foundation Declares War on Weight. Medically Su-

pervised Weight Loss. Lose weight safely, quickly and effortlessly through our proven weight reduction program.

2. *Medical Weight Loss, Inc.:*

Losing Weight is a Doctor's Business. Now You Can Lose Weight . . . Through a Proven Method—Fast . . . using the safe and practical Dr. A. T. W. Simeons method of weight reduction.

3. *Bariatic Medical Clinics Management Corporation:*

Medical Weight Reduction. Bariatrics individual program is a safe and practical method for the entire family to lose weight . . . .

4. *Weight Reduction Medical Clinic:*

Look At Me Now. I Lost 26 lbs. in 6 weeks! I didn't sign any contracts or take any pills!

5. *HCG Weight Clinics Foundation:*

Lose Weight Now—to look better—to feel better—to perform better.

Featuring Dr. A. T. W. Simeon's "Pounds & Inches" Method. HCG Weight Clinics Foundation can improve your appearance and attractiveness—and help you stay that way.

## III. THE ISSUES

A. *Alleged Violations of the Act*

The FTC contends that respondents have violated Sections 45 and 52 of the Act. As amended by the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act which became effective January 4, 1975 (P.L. 93–637, 93d Cong., 2d Sess. (1974)), Section 45 provides in pertinent part:

"(a)·(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

Section 52 as amended by the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act provides:

"(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

(1) By United States mails, or in or having an effect upon commerce by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or

(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce of food, drugs, devices, or cosmetics."

■ Section 15 of the FTC Act, 15 U.S.C. § 55, in pertinent part, defines "false advertisement" to mean:

"An advertisement * * * which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account [among other things] * * * the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

Thus, an advertisement may be a "false advertisement" both for the statements or representations it actually makes, and for the statements or representations it fails to make.

Since respondents' clinics are registered with the State of California as a pre-paid health plan under the Knox-Mills Health Plan Act (California Government Code § 12530 et seq.), the clinics have the right to advertise their availability. The FTC does not take issue with the fact that the clinics advertise, but rather with the type of advertisements respondents use. Specifically,

the FTC contends that respondents' advertisements are false and deceptive because:

1. The advertisements represent that the weight reduction treatment is safe, effective, and medically approved, when in fact it is not;

2. The advertisements fail to mention the material facts that:

(a) The treatments are based upon the injection of a hormone drug;

(b) That the drug is not recognized by experts as safe and/or effective for use;

(c) That there is no valid scientific evidence that the drug promotes weight loss that could not be achieved by diet alone; and

(d) That the drug is not approved for use in weight reduction by the FDA and, on the basis of current evidence, could not be approved if its manufacturers attempted to obtain a license; and

3. The advertisements contravene the spirit of the Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.) by promoting a weight reduction treatment based on a drug that has not been FDA approved for weight control.

### B. *Commerce*

Respondents contend that Section 45 of the Act does not apply to them since their advertisements are not "in or affecting" commerce. Respondents base this contention on the fact that their California clinics have never offered weight reduction treatments to out-of-state residents. Since all of their California clinics are located at least four hours' drive from the state borders and since the Simeons method requires daily clinic visits, respondents claim there is no feasible way they could ever service out-of-state customers.

■■ I find that respondents' advertisements are sufficiently involved in or affecting commerce to invoke the jurisdiction of Section 45 of the Act. It is undisputed that the respondents place their advertisements in newspapers, magazines, and on television with out-of-state circulations and broadcasting ranges. The Act is aimed at prohibiting the dissemination of false advertising, not with prohibiting the actual sales that may flow from the publicity. Even without an out-of-state sale, the fact that respondents cause their advertisements to be disseminated out of state is enough to fulfill the commerce requirements of the Act. Shafe v. Federal Trade Commission, 256 F.2d 661 (6th Cir. 1958).

Furthermore, several of the respondents operate weight reduction clinics outside of California. Although a prospective out-of-state patient may not be able to make the four-hour trip to one of the California clinics, the advertisement published in California and circulated out of state may well cause an out-of-state customer to visit a more conveniently located clinic outside of California.

Respondents further contend that Section 52 of the Act does not apply to them since they offer and advertise a treatment program, not the sale of a drug, device, or cosmetic. I find that respondents' advertisements are sufficiently likely to induce the purchase of a drug to invoke the jurisdiction of Section 52 of the Act.

■ Respondents' claim that their advertisements are not aimed at inducing the purchase of a drug, but rather deal with a treatment program is a distinction without a difference in this case. Although respondents' advertisements do not specifically mention HCG or the injection regimen, HCG injections are a crucial component in the treatment program. Anyone accepted into the program is placed on daily HCG injections and a portion of the treatment fee goes toward the cost of these injections. The hypodermic injection of HCG legally constitutes a sale transaction although the injection is administered by a physician or nurse and the drug is never directly placed in the hands of the purchaser. Ratigan v. United States, 88 F.

2d 919 (9th Cir. 1937). Therefore, anyone responding to the advertised treatment program will, in fact, purchase the drug HCG. Dissemination of advertisements publicizing this drug-based treatment is enough to meet the requirement of Section 52 that the advertisement in or affecting commerce is likely to induce the purchase of a drug. Mueller v. United States, 262 F.2d 443 (5th Cir. 1958).

## C. *Likelihood of Success on the Merits*

### 1. *Misrepresentations*

I find that the FTC does not have a strong likelihood of establishing at the administrative proceedings on their complaint before the Commission that the respondents' advertisements are false and misleading either on account of material misstatements or material omissions. The Court must analyze the advertisements of respondents in their entirety in order to ascertain the net impression which the advertisement is likely to make upon the general public. FTC v. Sterling Drug Inc., 317 F.2d 669 (2d Cir. 1963). Taken as a whole, I find that respondents' advertisements indicate that they offer a safe, effective, medically approved weight loss program. I find there is a strong likelihood that the Commission will ultimately determine that in truth this is just what respondents do offer. The advertisements do not mention HCG, but rather publicize the treatment program as a whole. Respondents', the FTC's, and the Court's medical experts all agree that the six week, 500 calorie, restricted diet that is part of the treatment program will produce weight loss. Although general medical consensus does not consider HCG effective in physiologically producing weight loss, the HCG component of the program may make it psychologically easier for the overweight patient to maintain the strict diet. Whether or not HCG actually has a physiological or psychological effect, there is substantial evidence indicating that the treatment program as a whole does result in weight loss. This is what respondents' advertisements claim.

I find there is a strong likelihood that the Commission will ultimately determine that respondents' treatment is safe. There is no evidence to show that HCG is unsafe in the 125 I.U. dosages used in the Simeons method. The pharmacological effect of the drug HCG has not been extensively reported in the medical literature. There have been no totally adequate and well-controlled studies establishing either the safety or the lack of safety of HCG in weight reduction treatments. The FDA has not yet conducted hearings on this matter. The FDA has, however, found HCG safe when used in much larger dosages for other purposes. There is no reason to believe these findings, based upon adequate and well-controlled studies of HCG for other uses, do not also demonstrate the safety of HCG in the treatment of obesity. Several studies that are less than totally adequate and well controlled indicate that HCG is safe for use in the treatment of obesity.

Nor has clinical experience with the drug suggested a safety problem. HCG was first used for the treatment of obesity in the United States in 1954. The Physicians' Desk Reference (a compendium of package inserts for various drugs) for the years 1958–1967 inclusive approved the use of HCG in the treatment of obesity. Thousands of patients over the past 20 to 25 years have been treated for obesity with the 125 I.U. dosages given in the Simeons method. These years of clinical experience with HCG have not indicated that the drug is unsafe.

It is true that an individual following the Simeons 500 calorie diet does experience some protein loss due to the restricted food intake. However, there has been no showing that the short-term diet is actually "unsafe". When one considers the health hazards involved in obesity and the resulting health benefits from the weight loss achieved from the short-term restricted diet, there is a strong likelihood that the Simeons method will ultimately be determined to be safe.

I also find that it is unlikely that the Commission will determine that the advertisements misrepresent the fact that the weight reduction program is medically approved. Although HCG has not been approved by the FDA for use in weight loss, this does not mean that the treatment program does not have the approval of the medical community. Although the majority of physicians do not believe that HCG physiologically promotes weight loss, many physicians with extensive practices in weight control do believe that HCG has a psychological or placebo[3] effect that is beneficial in the weight treatment program. For example, the Court-appointed expert witness, Dr. John Karam, the Associate Director of the Metabolic Research Unit for the University of California, indicated that he thought the program as a whole was effective and that in the context of the counseling program and the diet, the HCG injections might be "functionally effective".

### 2. Material Omissions

I find that the FTC does not have a strong likelihood of establishing that respondents have violated the Act by failing to include the material facts that the treatments are based upon the injection of a hormone drug; that the drug is not recognized by experts as safe and/or effective for use; that there is no valid scientific evidence that the drug promotes weight loss that could not be achieved by diet alone; and that the drug is not approved for use in weight reduction by the FDA and, on the basis of current evidence, could not be approved for such a use.

### (a). Failure to Inform Patient of Use of Unapproved Drug

■ Both respondents' and the FTC's experts agree that it is not general medical practice to inform a patient whether or not a drug is FDA approved. Respondents manage the clinics and adver-

tise the availability of the treatment program. Licensed physicians and nurses prescribe and administer the actual treatment. Although it is perfectly proper for a prepaid health plan to advertise under the Knox-Hill Act (California Government Code § 12530 et seq.), under the medical canons of ethics, the individual doctor is precluded from advertising. Since the individual doctors are responsible for the treatment, the FTC, by insisting on the inclusion of what the treatment will entail in the advertisements, is asking the individual physicians to advertise what it is they, not the respondents, will do. Not only would this be contrary to medical ethics, it is beyond the scope of the FTC's powers. The direct control of medical practice has been left to the states and is beyond the power of the federal government. Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925).

Furthermore, forcing respondents to advertise that HCG was no more effective than diet alone, would destroy a valuable psychological component of the program. Although there is no scientific evidence to indicate that HCG physiologically promotes weight loss, there is medical consensus that HCG has a psychological or placebo effect that makes it easier for a patient to maintain the strict, 500 calorie diet. Placebos are widely used in medical practice. Their benefits are derived from the fact that the patient believes the drug will work. A physician does not normally inform a patient that a placebo is being used since this would destroy the effectiveness of the drug. If respondents were forced to advertise that the HCG was not any more effective than diet alone, they would be forced to destroy the patient's belief in the drug and the medically acknowledged beneficial placebo effects that result from this belief. Rather than protecting the public, this disclosure might actually harm the overweight and obese individuals who have heretofore

---

3. A placebo is a substance having no pharmacological effect, but which is given to a patient who supposes it to be an effective medicine for the condition for which it is

prescribed. Because of the patient's belief in the drug, the substance will often prove to be an effective medicine.

been able to stick to the Simeons method and lose weight precisely because they believed that HCG was helping them.

### (b). *Use of "New Drug"*

I find that the FTC does not have a good likelihood of ultimately establishing that respondents violate Sections 45 and 52 of the Act because their advertisements fail to state that their treatment program is based on a drug that has not been approved by the FDA for weight loss. The Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355) authorizes the FDA to restrain the introduction into interstate commerce of any new drug unless the drug has been approved by the FDA.

Under the Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), it is illegal to market and label a "new drug" for a use that is not FDA approved. As defined by the Food, Drug and Cosmetic Act (21 U.S.C. § 321(p)), a new drug is a drug that has not been "generally recognized among experts * * * as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof". The FTC argues that HCG is a "new drug" within the meaning of the FDA Act and has not been FDA approved for weight loss. The FTC contends that it is, therefore, unfair and false to permit the dissemination of advertisements for a treatment which is based on this unapproved "new drug" within the meaning of the Food, Drug and Cosmetic Act.

▐ The Court need not reach the question of whether or not HCG is a "new drug". Even assuming *arguendo* that HCG were a "new drug", it would not be a violation of Sections 45 or 52 of the Act to advertise a treatment program that utilized this unapproved "new drug". Whether or not HCG is a "new drug", respondents are not required to seek FDA approval for the use of HCG in treatments administered by licensed physicians. The FDA has stated that the 1938 Food, Drug and Cosmetic Act and the 1962 amendments to that Act did not intend to interfere in or to regulate the practice of medicine between the physician and the patient. The FDA has stated that if a drug that has FDA approval for specific uses is used by a treating and prescribing physician for an unapproved use, this is not considered a "new drug" use that would require the physician to file an investigational new drug plan or to submit a new drug application:

> " * * * the physician may, as part of the practice of medicine, lawfully prescribe a different dosage for his patient, or may otherwise vary the conditions of use from those approved in the package insert, without informing or obtaining the approval of the Food and Drug Administration.

This interpretation of the Act is consistent with congressional intent as indicated in the legislative history of the 1938 Act and the drug amendments of 1962. Throughout the debate leading to inactment, there were repeated statements that Congress did not intend the Food and Drug Administration to interfere with medical practice and references to the understanding that the bill did not purport to regulate the practice of medicine as between the physician and the patient." 37 Fed.Reg. 16503 (1972). Therefore, whether or not HCG is a new drug, the FDA does not require these respondents to seek FDA approval prior to its prescription in their weight-control treatments.

▐ Furthermore, the FDA does not have jurisdiction to regulate the administration of a drug by a physician. In order to invoke the jurisdiction of the FDA, 21 U.S.C. § 355(a), requires a person to:

> " * * * introduce or deliver * * * into interstate commerce any new drug * * *."

Even assuming *arguendo* that HCG is a new drug under the definition of new drug (21 U.S.C. § 321(p)), the California physician in his private treatment of a California patient with HCG is engag-

ing in a manifestly different quantitative and qualitative act than introducing or delivering for introduction into interstate commerce. The FDA interpretation of the 1938 Act and its 1962 Amendments does not treat the use of HCG by a treating and prescribing physician as being in interstate commerce. The FDA has stated:

"If an approved new drug is shipped in interstate commerce with the approved package inserts, and neither the shipper nor the recipient intend that it be used for an unapproved purpose, the requirements of section 505 of the Act are satisfied. Once the new drug is in a local pharmacy after interstate shipment, the physician may, as part of the practice of medicine, lawfully prescribe a different dosage for his patient, or may otherwise vary the conditions of use from those approved in the package insert, without informing or obtaining the approval of the Food and Drug Administration." 37 Fed.Reg. 16503 (1972).

Since it is not illegal for respondents' clinics to use HCG for weight control, it is unlikely that the Commission will ultimately determine that it is illegal for respondents to advertise this legally permissible treatment plan.

### D. *Balancing the Equities*

In deciding whether the FTC has made a proper showing that equitable relief should be granted, the Court must also balance all of the equities. The respondents argue that an injunction prohibiting their advertising as long as they use HCG or any other unapproved drug, in their treatment would be financially ruinous. Balanced against this, the Court must consider the possible harm to consumers which may result from the use of the unapproved drug. The Court must also consider the cost to the consumers.

I find that the equities weigh against granting the requested relief. HCG has been widely used in clinical medicine both for weight reduction and for other treatment purposes. There is no evidence that HCG administered in the 125 I.U. dosages prescribed in the Simeons method is unsafe. Although HCG is contraindicated for use in individuals with diabetes mellitus and tumor of the pituitary gland, respondents eliminate such persons from their treatment program during the initial screening and testing visit.

Since the cost of the Simeons treatment is the same as, or less than, the cost of comparable university endocrine clinic programs for weight reduction, the public is not injured by inflated prices for the treatments they are receiving.

Although the medical opinion is divided on the efficacy of HCG in weight reduction, respondents have demonstrated that their treatment program, which relies heavily on the HCG injections, does help many people to lose weight. In balancing the equities, I must also consider the needs of these obese people to have readily available, effective weight reduction treatments which meet their physiological and psychological needs. The success of the treatment, even if only successful for a limited portion of the population, weighs heavily against granting the injunctive relief.

I find that respondents' business would suffer financially if they were precluded from advertising. Respondents require a high volume of business generated by advertising to sustain their specialized medical practice at a reasonably low cost to the public. Although respondents' business losses would not be controlling if there were proof of harm to the public (FTC v. National Health Aids, *supra*), in the instant case, where the public has not been injured by the Simeons weight treatments, the equities favor denying the injunctive relief.

### IV. CONCLUSION

I find that the FTC has not made a proper showing that there is reason to believe respondents have violated Sections 45 and 52 of the Act. Accordingly, I deny the FTC's motion for a preliminary injunction.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure this Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law, and pursuant thereto:

It is ordered that:

1. The FTC's motion for a preliminary injunction is denied.

2. Respondents shall bear the costs of the fee for the Court's appointed expert witness, Dr. John Karam. Dr. Karam's fee shall be two hundred dollars ($200). The fee shall be paid directly to Dr. Karam and payment shall be made by March 25, 1975. Evidence of such payment shall be filed with the Court by March 25, 1975. Dr. Karam's address is University of California Medical Center, H.S.W. Room 1141, 501 Parnassus Avenue, San Francisco, California 94143.

3. Respondents shall submit a judgment in accordance with the foregoing by March 21, 1975.