**FEDERAL TRADE COMMISSION, Petitioner-Appellant,**

v.

**SIMEON MANAGEMENT CORPORATION et al., Respondents-Appellees.**

No. 75–2363.

United States Court of Appeals, Ninth Circuit.

March 2, 1976.

As Amended March 22, 1976.

---

James P. Timony, Atty. (argued), FTC, Washington, D. C., for petitioner-appellant.

Jerry S. Phillips (argued), Los Angeles, Cal., for respondents-appellees.

OPINION

Before DUNIWAY and KENNEDY, Circuit Judges, and PALMIERI,* District Judge.

---

* Honorable Edmund L. Palmieri, United States District Judge, Southern District of New York, sitting by designation.

1. The clinics are registered under the Knox-Mills Health Plan Act, Cal. Gov't Code §§ 12530–39.7 (West Supp.1975). Pursuant to state law, their advertisements have been re-

ANTHONY M. KENNEDY, Circuit Judge:

The Federal Trade Commission Act authorizes district courts to enjoin unfair or deceptive practices pending final resolution of administrative proceedings for cease-and-desist orders. 15 U.S.C. § 53(a) (1970); *id.* § 53(b) (Supp. IV, 1974). In this case the district court denied the FTC's application for such an injunction against advertising by the respondents' weight reduction clinics. 391 F.Supp. 697 (N.D.Cal.1975). We affirm.

The respondents operate weight reduction clinics in California, under various ownerships and trade names. The clinics advertise in magazines, newspapers and on television that their weight loss programs are safe, effective and medically approved.[1] The cost of their treatment programs varies from about $100 to $300, which is comparable to or less than weight reduction treatments from private physicians or university clinics.

All of the clinics in this case use the "Simeons" method for weight loss. After an initial physical examination by a licensed physician, patients are given a four to six week treatment program consisting of a 500 calorie daily diet, medical counseling, and daily injections of human chorionic gonadotropin [HCG]. HCG is a prescription drug approved by the Food and Drug Administration for some uses but not for the treatment of obesity.

In October 1974 the FTC initiated administrative proceedings against the respondent clinics, charging false and unfair advertising in violation of 15 U.S.C. §§ 52 & 45 (1970), *as amended* (Supp. IV, 1974).[2] At the same time, the Commission applied in federal district court for a preliminary in-

viewed by the California attorney general prior to publication. *See id.* § 12537(b).

2. Section 52 makes unlawful the dissemination of any "false advertisement" to induce "directly or indirectly the purchase of food, drugs, devices or cosmetics"; this section also makes such dissemination an "unfair or deceptive act or practice" within the meaning of § 45.

junction under sections 53(a) & (b). In March 1975 the district judge denied the application on the grounds that the FTC was unlikely to succeed on the merits in its administrative proceedings and that the equities of the case did not favor injunctive relief. In June 1975 the FTC administrative law judge granted a modified version of the requested cease-and-desist order; that decision is now before the Commission on appeal. Simeon Management Corp., FTC Docket No. 8996 (June 18, 1975) (initial decision), *summarized* 3 CCH Trade Reg. Rep. (1975 Trade Cas.) ¶ 20,930. The district court subsequently denied the Commission's motion for an injunction pending appeal of the court's earlier decision.

## I. SCOPE OF REVIEW AND FTC JURISDICTION

The district court's denial of a preliminary injunction is subject to a particularly narrow scope of review in this court. "The grant or denial of a preliminary injunction is subject to reversal only if the lower court based its decision upon an erroneous legal premise or abused its discretion." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975), *citing Douglas v. Beneficial Finance Co.,* 469 F.2d 453, 454 (9th Cir. 1972), *and Burton v. Matanuska Valley Lines,* 244 F.2d 647, 651, 17 Alaska 298 (9th Cir. 1957). Thus we are bound by the district court's resolution of conflicting evidence and other findings of fact. If the court applied the proper legal standard, we cannot reverse its decision unless denial of the injunction was

"False advertisements," as prohibited by § 52, are defined elsewhere in the Act as those "misleading in a material respect," including either misstatement or nondisclosure of material facts. 15 U.S.C. § 55(a)(1)(1970).

Section 45 makes unlawful "unfair methods of competition" and "unfair or deceptive acts or practices." The FTC is authorized to issue complaints, hold hearings, and issue cease-and-desist orders for violations of this section. Other portions of this section provide for preenforcement review of FTC orders in the United States Court of Appeals.

so unjustified as to constitute an abuse of discretion.

The district court's finding that some of the respondents' advertising circulated out of state was a sufficient basis for its conclusion that the FTC had jurisdiction to regulate that advertising. *Shafe v. FTC,* 256 F.2d 661, 663–64 (6th Cir. 1958).[3] The district court also correctly held that this case fell within the scope of section 52, as involving advertising "for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics." It is true that the respondents' advertising does not specifically mention HCG, and the drug is not sold separately from the treatment programs. But the advertising does induce the purchase of treatment programs which include administration of the drug, and thus it indirectly induces purchase of the drug. This is sufficient to fall within the broad language of section 52. *See Mueller v. United States,* 262 F.2d 443, 447–48 (5th Cir. 1958).

## II. THE LEGAL STANDARD FOR GRANTING § 53 INJUNCTIONS

We first consider whether the district court adopted the correct standard in determining the propriety of granting injunctive relief under section 53(a). This section authorizes the Commission to apply to a federal district court when it "has reason to believe" that section 52 (false food and drug advertising) is being violated and that an injunction would be in the public interest. "Upon proper showing" the court is required to grant an injunction without bond, pending the final resolution of administra-

3. When the FTC issued the complaint in this case, § 45 applied to activities "in commerce" and § 52 applied to false advertising which was itself "[b]y United States mails, or in commerce" or which was to induce a purchase "in commerce." A provision in the Trans-Alaska Pipeline Act expanded the scope of §§ 45 and 52 from matters "in commerce" to those "in or affecting commerce." 15 U.S.C. § 45 (Supp. IV, 1974); *see id.* § 52. However, this change in jurisdiction does not apply to matters occurring prior to the date of enactment [January 4, 1975]. Pub.L. No. 93–637, § 205(b), 88 Stat. 2193, 2200.

tive proceedings for a cease-and-desist order.[4]

Section 53(a) has been interpreted in two ways. One interpretation would make a "reasonable belief" by the FTC the requisite standard, requiring the district court to issue an injunction whenever there is a "justifiable basis" for that belief. *FTC v. Rhodes Pharmacal Co.,* 191 F.2d 744, 747–48 (7th Cir. 1951), *noted in* 65 Harv.L.Rev. 349 (1951). The other view is that the Commission's reasonable belief serves as a prerequisite only to the *application* for an injunction; the court itself must make further inquiries before granting this extraordinary remedy. Under this view, the "proper showing" specified in section 53(a) requires an independent examination of the merits and a consideration of the equities affecting all the parties. *FTC v. National Health Aids, Inc.,* 108 F.Supp. 340, 346 (D.Md.1952). *See also FTC v. Sterling Drug, Inc.,* 317 F.2d 669 (2d Cir. 1963) (denying injunction upon finding that advertisements were not false, without deciding relevance of equitable considerations).

In 1973 Congress amended the Act by adding a new section 53(b), authorizing the FTC to seek an injunction when it believes there is a violation of "any provision of law" it enforces. This section thus applies to a broad range of violations other than false food and drug advertising, and it also contains procedural provisions not included in section 53(a). For purposes of this case, the relevant distinction is that the new section defines a "proper showing" as follows: "[T]hat, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b) (Supp. IV, 1974).[5]

On this appeal the FTC contends that the district court erroneously applied the standard for a proper showing under section 53(b) to that part of its action which alleged false drug advertising and thus fell under section 53(a). The Commission argues that

4. The complete section provides:
Whenever the Commission has reason to believe
   (1) that any person, partnership, or corporation is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 52 of this title, and
   (2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 45 of this title, and until such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission to cease and desist made thereon has become final within the meaning of section 45 of this title, would be to the interest of the public,
the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States or in the United States court of any Territory, to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted without bond. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.
15 U.S.C. § 53(a) (1970).

5. The complete section provides:
Whenever the Commission has reason to believe
   (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
   (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public
the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.
15 U.S.C. § 53(b) (Supp. IV, 1974).

its burden under section 53(a) should be lighter, suggesting that false food and drug advertising is more serious than other violations of the laws it enforces. It relies on *FTC v. National Commission on Egg Nutrition,* 517 F.2d 485, 488–89 (7th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3244 (U.S. Sep. 15, 1975) (No. 75–405). There the Seventh Circuit concluded that the inclusion of specific standards in section 53(b) evidenced a congressional intent to leave the proper showing requirement of section 53(a) unchanged, and reaffirmed its *Rhodes Pharmacal* decision.

■ There is indeed no indication that the new section was intended to alter the proper showing previously required under section 53(a). However, we believe that the showings required for injunctions under each section are essentially the same. The conference report on the new section 53(b) stated that its language on a proper showing was intended to codify the decisional law of *FTC v. National Health Aids, Inc.,* and *FTC v. Sterling Drug, Inc., supra.* Thus under both sections, Congress considered that the function of the district court is to "exercise independent judgment on the propriety" of an injunction. Conf. Rep.No.924, 93d Cong., 1st Sess., *reproduced in* 2 U.S.Code Cong. & Admin.News 2523, 2533 (1973). Although not always dispositive, the interpretation of a statute by the drafters of subsequent legislation is entitled to significant weight. *FHA v. The Darlington, Inc.,* 358 U.S. 84, 87–88 & n. 3, 90, 79 S.Ct. 141, 144, 145, 3 L.Ed.2d 132, 135–136, 137 (1958); *see NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 279–84, 94 S.Ct. 1757, 1762, 1764–1767, 40 L.Ed.2d 134, 143, 145–148 (1974). Accordingly, we conclude that a "reasonable belief" on the part of the FTC is insufficient to constitute a proper showing under section 53(a). The district court must conduct essentially the same independent inquiry as required explicitly in section 53(b).

■ This interpretation of section 53(a) avoids the constitutional problems that.

would be presented if only the FTC's reasonable belief were required for an injunction. *See Yates v. United States,* 354 U.S. 298, 319, 77 S.Ct. 1064, 1077, 1 L.Ed.2d 1356, 1375 (1957); *Ashwander v. TVA,* 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936) (Brandeis, J., concurring); *Brown v. EPA,* 521 F.2d 827, 842 (9th Cir. 1975). Although commercial advertising may be subject to regulation serving an important public interest, it is not beyond the protection of the first amendment. *Compare Bigelow v. Virginia,* 421 U.S. 809, 818–21, 825–26, 95 S.Ct. 2222, 2230–2232, 2234–2235, 44 L.Ed.2d 600, 609–611, 613–614 (1975), *with Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 388–89, 93 S.Ct. 2553, 2560–61, 37 L.Ed.2d 669, 678–79 (1973). It is generally accepted that false commercial advertising may be prohibited. *E. g., E. F. Drew & Co. v. FTC,* 235 F.2d 735, 740 (2d Cir. 1956), *cert. denied,* 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323 (1957); *see Bigelow v. Virginia, supra,* 421 U.S. at 828 & n. 13, 95 S.Ct. at 2236, 44 L.Ed.2d at 615 (by implication). When potentially protected speech is subjected to prior restraint, however, procedural safeguards are vitally important. *Carroll v. President & Commissioners of Princess Anne,* 393 U.S. 175, 181–82, 89 S.Ct. 347, 351–352, 21 L.Ed.2d 325, 331–332 (1968). Such safeguards would be inadequate if courts were required under section 53(a) to enjoin advertising because the FTC claimed it was false, without first making an independent determination of the sufficiency of that claim. *See Jacobellis v. Ohio,* 378 U.S. 184, 190 & n. 6, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793, 799 (1964) (opinion of Brennan, J.); *Crowell v. Benson,* 285 U.S. 22, 54–65, 52 S.Ct. 285, 293–298, 76 L.Ed. 598, 614–620 (1932). We therefore interpret the statutory requirement for a "proper showing" as compelling such an independent determination by the district court.

In summary, we conclude that the legal standard for granting an injunction under either section 53(a) or 53(b) requires the district court independently to determine whether an injunction would be in the pub-

lic interest. The court must base this determination on the likelihood that the FTC will succeed on the merits in proceedings for a final cease-and-desist order and on the balance of equities. Thus we find that the district court adopted the correct legal standard in the instant case.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

The FTC advanced three principal charges in the administrative complaint, and in support of its application for a preliminary injunction. Two of the charges were for dissemination of false advertising in violation of section 52—both by making untruthful claims and by failing to disclose material facts. The third charge against the respondents' advertising was for unfairness in violation of section 45. The district court held that the FTC was unlikely to succeed in establishing any of its charges as violations of the Act and thus denied the preliminary injunction.

### A. *False Advertising By Misstatement*

The court found there was a strong likelihood that the principal claims made in the respondents' advertising—that the treatment programs were safe, effective and medically approved—would not be held untruthful. 391 F.Supp. at 704–05. On appeal the Commission argues that the finding regarding safety is clearly erroneous, because HCG is not safe for older men, who may have latent cancer of the prostate gland.[6]

The treatment programs in question involve the administration of 125 units of HCG six or seven times a week. The FDA has approved the use of HCG as safe and effective in much larger dosages for the treatment of certain cases of prepubertal cryptorchidism and hypogonadism in males and infertility in females.[7] However, HCG is contraindicated for patients with "prostatic carcinoma or other androgen-dependent neoplasm."[8] The effectiveness of HCG in treating certain conditions in males is caused by stimulating the production of testosterone; this is also the basis for its contraindication, since prostate cancer is sensitive to testosterone.[9]

The FTC contends that prostate cancer is widespread among older men and often undetectable in its incipient stage. Where HCG has been found safe and effective— for women, prepubescent males, and males with hypogonadism—prostate cancer is not a potential problem. Thus the FTC claims that HCG is dangerous in the treatment of obesity in older men, and that the physical examinations given by respondents cannot entirely eliminate this danger.[10]

The Commission's contentions regarding the safety of HCG are initially disturbing, especially since there is little evidence of the drug's effectiveness as a cure for obesity. Considerations of safety and effectiveness cannot be wholly separated, since many risky medical procedures may be regarded by the FDA as "safe," in light of their greater potential benefits. However, we conclude that the district

---

**6.** The Commission does not seriously challenge the district court's findings regarding effectiveness and medical approval. These representations were made on behalf of the complete treatment programs. Thus even if HCG were ineffective, the 500 calorie diet would produce weight loss. In addition, there was evidence of some medical opinion that HCG could psychologically assist a patient in adhering to the 500 calorie diet. *See* 391 F.Supp. at 704, 705.

**7.** Recommended dosages for males range from 500 to 5,000 units, normally administered three times a week for three to six weeks. One approved regimen called for three 4,000 unit doses per week for six to nine months, followed by three additional months of 2,000 unit doses. FDA Follow-up Notice on New Drug Application for Chorionic Gonadotropin, 39 Fed.Reg. 42397, 42402 (Dec. 5, 1974).

**8.** *Id.*

**9.** *Id.* at 42400.

**10.** The district court found that on the basis of initial physical examinations, the weight clinics rejected individuals suffering from those conditions for which HCG is contraindicated. 391 F.Supp. at 701.

court's finding regarding the safety of HCG is not clearly erroneous on the basis of the record below.

First, there was no evidence that the low-level dosages of HCG employed by respondents actually increase the levels of testosterone or other androgens in the blood, as do the much larger dosages used in treating sterility conditions.[11] Second, the effect of an increased level of testosterone on incipient prostatic carcinoma remains speculative. Thus the Commission's witness could only suggest a possibility of danger:

> My *opinion* is that it's *entirely possible* that these doses stimulate testosterone secretion and that that *might be harmful* to someone who has a latent tumor, a small cancer of the prostate.

Testimony of Dr. Robert Temple, R.T. 61 [emphasis added]. The court-appointed expert witness, on the other hand, testified that he knew of "no evidence in either direction that this dose of HCG, for this amount of time" would cause the growth of a latent prostate cancer. He also stated that the possible side effects "would not prevent me from suggesting its use in obese patients." Testimony of Dr. John Karam, R.T. 157. Finally, as the district court noted, there was no clinical evidence of harmful effects, such as the aggravation of prostatic cancer, resulting from the use of HCG in treating obesity. 391 F.Supp. at 704. On the basis of this record, we cannot say that it was clear error for the district court to reject the FTC's argument that the respondents' treatment programs were unsafe.

■ It is also significant that the decision of the FTC administrative law judge did not consider the danger of HCG for men with incipient prostatic cancer.

The determination as to (1) whether HCG is a new drug, and (2) whether HCG is safe and effective, insofar as its use for treating obesity and weight control are concerned, are for the Food and Drug Administration to make.

Initial Decision at 13. Moreover, there was no finding that the respondents' advertising included any misstatements or untruthful claims. Although the Commission is not bound by this initial decision, it is indicative of the course taken by the administrative proceedings. The purpose of section 53 is to protect those proceedings, and only in a rare case would a court be justified in making a finding of unlawful conduct which was not sustained in the FTC's initial decision.

### B. *False Advertising by Nondisclosure*

The FTC attacks the respondents' advertising as misleading for failure to reveal the following facts: (1) that the treatments involve injections of a drug, HCG; (2) that HCG is not approved by the FDA as safe and effective for the treatment of obesity; and (3) that there is no scientific evidence that HCG is more effective in producing weight loss than diet alone. The district court concluded the Commission was unlikely to succeed in establishing that these omissions made the respondents' advertising false under section 52.

Subsequent to the district court's decision, but prior to its order denying an injunction pending appeal, the FTC reached a contrary conclusion on this issue. The administrative law judge approved an order requiring the disclosure in future advertising of facts (1) and (2) above. Initial Decision at 11, 31–32; *see id.* at 20–22. However, this issue is subject to de novo determination by the Commission; more importantly, any final order of the Commission is subject to judicial review before it can be enforced. Thus the favorable initial decision does not necessarily assure the FTC of ultimate success. In predicting whether such success is likely, it is necessary to

11. The FDA report stated:
    The question of whether 125 units [of HCG] per day for more than one month will cause increased levels of blood androgens is thus an extremely important one. This question has not been answered. 39 Fed.Reg. 42397, 42400 (Dec. 5, 1974).

determine whether the FTC's initial decision applied the proper legal standard.

Section 55(a)(1) provides that a determination of false advertising should take into account both the representations made or suggested and the failure "to reveal facts material in the light of such representations or material with respect to consequences [of using] the commodity to which the advertisement relates   .   .  .."

█ The FTC has claimed that a material fact is one which, if made known to prospective purchasers, would influence their decision. See Initial Decision at 21. Yet no single advertisement could possibly include every fact relevant to the purchasing decision; nor is such comprehensiveness required by section 55(a)(1). Advertisers need not disclose negative aspects of their product, other than material consequences of normal use. Otherwise, an advertisement is misleading only if it fails to disclose facts necessary to dissipate false assumptions likely to arise in light of the representations actually made. There is disagreement as to whether such false assumptions must be actively promoted by the advertisement, or whether it is sufficient that an advertisement fails to correct an independently existing misapprehension about its product.[12] But there is no deception under either standard unless the public holds a belief contrary to material facts not disclosed. See generally Developments in the Law—Deceptive Advertising, 80 Harv.L. Rev. 1005, 1047–51 (1967).

In the instant case, the advertising included no information about the use of drugs or, more specifically, HCG in the weight reduction programs. The FTC presented no evidence that those seeing the advertisements formed a belief either that HCG was not used or that, if used, HCG had been approved by the FDA. This would be a different case if the respondents had advertised their use of HCG; one could plausibly suggest that the public would then assume that the drug was effective or approved by the FDA.[13]

Because we do not believe the nondisclosure in this case is materially misleading, we need not consider whether such deception could be justified by the "placebo" effect claimed for the drug. In any event, we note that the district court found that it was not customary medical practice to inform patients whether a prescribed drug was approved by the FDA.[14]

## C.   "Unfairness" Under § 45

The Commission also claimed the respondents' advertising could be enjoined under section 53(b), as unfair practices in violation of section 45.[15] However, the nature of this part of the FTC's complaint is somewhat unclear. Section 52 provides that violations of its provisions are automatically unfair practices for purposes of section 45. To the extent the FTC alleges violation of section 52, our determination supra that the district court correctly denied injunctive relief under section 53(a) precludes such relief under section 53(b).

Section 45 does prohibit a much broader range of practices than those incorporated by reference in section 52. Indeed the language of section 45 is so general that the FTC has developed an extensive body of administrative law to identify the types of practices which are "unfair" in violation of this provision. Unfairness in a particular

---

12.  Compare Alberty v. FTC, 86 U.S.App.D.C. 238, 182 F.2d 36, 39, cert. denied, 340 U.S. 818, 71 S.Ct. 49, 95 L.Ed. 601 (1950), with Brite Mfg. Co. v. FTC, 347 F.2d 477 (D.C.Cir. 1965). See also J. B. Williams Co. v. FTC, 381 F.2d 884, 890–91 (6th Cir. 1967).

13.  Some of the respondents' advertisements mention the "Simeons" method, and these present a somewhat closer question. However, the injunction sought by FTC was not limited to these advertisements but extended to all advertising by respondents. In addition, there is no evidence that the public is sufficiently aware of the nature of the "Simeons" method to associate it with the use of the drug HCG.

14.  See 391 F.Supp. at 705–06.

15.  Section 53(b) expressly requires the district court to consider the likelihood of success on the merits and to balance the equities before issuing an injunction. See note 5 supra.

case may turn a great deal on its facts, and thus in ruling on a section 53(b) injunction a district court may have some difficulty in predicting the eventual outcome of the administrative procedures.[16]

In the instant appeal, the FTC claims that the advertising is "unfair" because it encourages patronage of the respondents' clinics, which violate the public policy against use of drugs not established as safe and effective by the FDA. The district court properly rejected this contention, noting that the FDA has specifically recognized the legality of using drugs for purposes other than those for which they have been found safe and effective. 391 F.Supp. at 706–07.

We also note that if advertising is truthful and the underlying activity legal, then forbidding the advertising altogether because public policy disfavors the underlying activity would raise serious first amendment questions. *See Bigelow v. Virginia,* 421 U.S. 809, 821–22, 95 S.Ct. 2222, 2232–2233, 44 L.Ed.2d 600, 611–612 (1975). The FTC administrative law judge adopted similar reasoning in denying a total ban on advertising by respondents. Initial Decision at 28–29.

Other than the false advertising and public policy arguments, the FTC has not advanced any rationale for finding the respondents liable for unfair practices.[17] Thus the Commission failed to establish any likelihood of success on the merits of this claim.

## IV. BALANCE OF EQUITIES; CONCLUSION

In deciding whether to grant an injunction, the district court must weigh the equities as well as consider the Commission's likelihood of ultimate success. Where, as in the instant case, the court determines the Commission is unlikely to succeed on the merits, then injunctive relief would not normally be granted. *See FTC v. Sterling Drug Co., supra,* 317 F.2d at 678.

The district court held that the equities weighed against granting the injunction. The court found that the treatment programs were reasonably priced and effective in helping many patients to lose weight. The court also found that a ban on advertising would cause serious financial harm to the respondents, although it recognized that the public interest was the paramount consideration in this sort of case. 391 F.Supp. at 707. We cannot say that the district court abused its discretion in concluding that the equities favored denial of the injunction.

Our affirmance of the district court's decision to deny injunctive relief is largely a result of our narrow scope of review in such cases. In any future proceedings after the Commission has reached a final decision, we will accord it the deference to which it is entitled as a matter of law. We intimate no view in this opinion as to the appropriate disposition in that case.

AFFIRMED.

---

**16.** *See* Note, *"Corrective Advertising" Orders of the Federal Trade Commission,* 85 Harv.L. Rev. 477, 486–87 (1971).

**17.** We have previously suggested that the FTC may find advertising "unfair" under § 45 for failure to make disclosures, even if the omissions would not make the advertising "false" under § 52. *See Feil v. FTC,* 285 F.2d 879, 899 (9th Cir. 1960). Under this rationale, a § 53(b) injunction requiring disclosure would be proper in certain cases, even though § 53(a) would be unavailable for the same purpose. We need not reach this point, however, because the FTC's argument here and in the district court was in support of a total prohibition of advertising by respondents.